Sandra Kay ARIE, Plaintiff-Respondent,

v.

INTERTHERM, INC.,
Defendant-Appellant.

No. 44743.

Missouri Court of Appeals,
Eastern District,
Division Five.

Jan. 18, 1983.

Motion for Rehearing/Transfer to
Supreme Court Denied March 17, 1983.

Application to Transfer Denied
April 26, 1983.

Thomas M. Hanna, St. Louis, for defendant-appellant.

Richard S. McConnell, Jr., St. Louis, for plaintiff-respondent.

KELLY, Presiding Judge.

Intertherm, Inc., appeals from a judgment of the Circuit Court of the City of St. Louis for Sandra Kay Arie, plaintiff-respondent, following a jury verdict awarding Mrs. Arie $7,500.00 actual damages and $17,500.00 punitive damages on Count I of her petition for wrongfully discharging Mrs. Arie from employment with defendant-appellant for exercising rights under the Missouri Workers' Compensation Law, and $1.00 actual damages and $15,000.00 punitive damages on Count II of her petition for furnishing her a service letter which intentionally, falsely, and wrongfully stated the reasons why her employment with defendant-appellant was terminated.

On appeal Intertherm (as appellant shall hereinafter be identified) presents 11 Points Relied On as grounds for reversal of the judgment and remand to the trial court

with instruction to enter judgment on its behalf on each Count of Mrs. Arie's (as respondent shall hereinafter be identified) petition. Two of these are directed at whether Mrs. Arie made a submissible case on either Count; one on whether she made a submissible case as to punitive damages on either Count; five are directed to rulings of the trial court on the admissibility or exclusion of evidence during the course of the trial; two contend error by Mrs. Arie's counsel during argument; and one contends that the trial court erred in overruling Intertherm's motion for directed verdict on Count II of Mrs. Arie's petition because the Missouri Service Letter Statute is unconstitutional.

■ Inasmuch as Intertherm challenges the submissibility of the cases on both Counts of the petition we shall relate in some detail the pleadings and evidence supportive of the jury's verdict, giving Mrs. Arie the benefit of any and all reasonable inferences to be drawn from the evidence which is not in conflict with her theory of the case and disregarding Intertherm's evidence unless it aids Mrs. Arie's case. *Kaelin v. Nuelle,* 537 S.W.2d 226, 232[6] (Mo. App.1976).

Count I of Mrs. Arie's petition alleges, Intertherm's Corporate organization and that on or about April 24, 1978, while an employee of Intertherm and acting within the scope of her employment she sustained an injury for which she exercised her rights under the "Missouri Workmen's (sic) Compensation Law" by consulting Intertherm's physician and remaining off of work pursuant to the advice of said physician, and subsequently filed a claim under the aforesaid law. That, contrary to § 287.780 Mo. R.S., Intertherm, on May 10, 1978, wrongfully and intentionally discharged her for exercising her rights under the Compensation Act; that as a result of her wrongful discharge she sustained a loss of income in an approximate amount of $6,000.00 and would continue to lose income in the future. She prayed judgment against Intertherm in the amount of $15,000.00 actual damages and $1,000,000.00 punitive damages and her costs.

Count II of Mrs. Arie's petition realleged Intertherm's corporate capacity, and alleged further that while a production employee of Intertherm and while so engaged in such work and within the scope of her employment she sustained an injury on or about April 24, 1978, which caused her to remain away from work until approximately mid August, 1978. That on or about May 10, 1978, Intertherm discharged her and pursuant to § 290.140 RSMo. she, on or about June 13, 1978, requested a service letter; that on or about June 30, 1978, Intertherm furnished her a service letter wherein it was stated, "You were terminated May 10, 1978, as having voluntarily quit, because as a temporary employee you did not qualify for a leave of absence." She further alleged that the reasons given for termination of her employment were intentionally false and wrongful because Intertherm's published policy was at all times mentioned in the petition that after a 90 day probationary period all production employees were placed on the permanent seniority list as of the date of original employment; that she had been in Intertherm's employment more than 90 days when she sustained her injury, and was damaged as a result of the false and wrongful reply of Intertherm to her request for a service letter. She prayed judgment for $15,000.00 actual damages and $1,000,000.00 punitive damages plus her costs on this Count.

Intertherm filed an Answer, which, as later amended, admitted as to Count I of Mrs. Arie's petition its corporate existence but denied all other allegations therein. As to Count II, it admitted its corporate existence, Mrs. Arie's request for a service letter, and that its reply to said request was as alleged in paragraph 5 of Mrs. Arie's petition.[1] It also denied all of the other allegations in Count II of the petition.

1. Paragraph I of Intertherm's Answer to Count II of the Arie's petition states, "Defendant admits the allegations contained in paragraph 1, 4 and 4 of Count II of the Petition." Paragraph 2

Subsequently but prior to trial, Intertherm amended its previously filed Answer by setting up defenses to each Count of the Arie's petition. As to Count I it alleged a discharge and release and as to Count II it challenged the constitutionality of § 290.-140 RSMo.1978.

With the pleadings in this status the cause came on for trial and from the evidence we conclude the jury could have found that Mrs. Arie made application for "Full Time" employment as a "Factory" worker with Intertherm, on or about September 12, 1977. At that time she was an unskilled worker with a high school education and a previous employment record over a period of slightly more than seven years being that of bartender or waitress in three different restaurants.

Intertherm manufactures, markets and distributes heating and cooling systems for commercial and residential buildings and its work is seasonal in nature so that its peak demand for employees is during the winter and summer seasons, and, in those seasons of the year when demands for its product are down, it has found it necessary to lay off numerous employees. The company had experienced periods where it would hire as many as a hundred employees only to have to lay them off for lack of work a month later; a practice which hurt personnel and labor relations. To avoid this problem, Intertherm between 1976 and 1980, hired all but skilled workers on a six month basis, making them permanent employees thereafter if there was a job available for them and if the job performance was satisfactory.

Despite this practice of hiring these employees on a six month basis, Intertherm's Director of Personnel and Employee Relations, Robert C. Long, compiled a handbook entitled "Temporary Employee Handbook" addressed "To: New Intertherm Employees" wherein it is stated that the first 90 days of employment with Intertherm was a probationary period; that this was a period for demonstrating basic ability to perform the job for which one was hired; that during this period evaluation forms would be sent to the employee's immediate supervisor every 30 days and he, in turn, would score them according to the employee's performance to that date, and if he judged the employee's necessary skills to be lacking, termination could result. It further stated that all production employees who, at the end of 90 days, met shop requirements through their own abilities would be placed on the permanent seniority list as of the original date of employment.

Mr. Long testified that this Handbook, titled "Temporary Employee Handbook," was a temporary handbook directed to new Intertherm employees. No section of the Handbook, other than the section on holidays, specifically limits its contents to any particular class of employees, temporary or permanent. According to Donald McClure, Intertherm's Manager, Employee Relations, and Safety Coordinator, this Handbook was not distributed to temporary employees.

There were two cover letters on the Handbook dated December 7, 1977, directed to "New Intertherm Employees" cautioning them that many changes were occurring at Intertherm and some of these changes affected the information and rules that new employees needed to know; that a new handbook was needed but Intertherm had been unable to get it done and this temporary Handbook was being provided and new employees were encouraged to read and become familiar with it; although not everything in it was completely accurate. The cover letter further advised the employee that if he or she was confused by what was said in the Handbook or had a question, they should ask their supervisor to explain it to them so they'd be sure they understood. It stated further that those in the Personnel Department were going to try to get a permanent handbook out to all the employees as soon as it could.

of the same Answer states, "Defendant denies the allegations contained in paragraphs 2, 3, 6 and 7 of Count II of the petition." From this we conclude it logical that Intertherm also admitted paragraph 5 of said Count, and the second "4" in paragraph 1, of said answer is a typographical error.

Mrs. Arie was interviewed by Mr. McClure on January 16, 1978. She testified that during this interview Mr. McClure advised her she would be a temporary employee for 90 days, a trial period, and thereafter she would have the rights of a "full", or "full-fledged employee of Intertherm." She also testified that Mr. McClure gave her the Temporary Employee Handbook when she was hired at the time of the interview, told her these were the rules and regulations of Intertherm and to read it over. She further testified that she signed an employment agreement without reading it after Mr. McClure told her that it contained "just things that we have discussed in our interview today." She explained that she would have signed anything at that time because she needed a job desparately and she had faith in the man she was going to work for, that he was telling her the truth, and that they'd discussed the documents that she was about to sign in their interview.

This agreement Mrs. Arie admitted bore her signature reads as follows:

"I, Sandra Arie, hereby apply for temporary employment with *Intertherm, Inc.* and I understand and agree that because the position is temporary, the rate of pay will be less than pay for full time employment; that the job will last no longer than six (6) months from my date of hire; that I will not be eligible for permanent employment; and that, when the temporary employment is ended, I shall have no recall rights.

I further understand that my rate of pay will be the only privilege of my employment and I will not be entitled to, or receive seniority rights or any fringe benefits such as, but not limited to, vacations, insurance of any kind, paid funeral leave, or the right to bid on premium jobs or transfer to a different department.

I agree to temporary employment under the terms and conditions outlined above."

On April 25, 1978, while hammering pins into place on blower housings at Intertherm's Gustine Avenue plant, Mrs. Arie experienced an excruciating pain in her right ear. This occurred about 20 minutes prior to quitting time. She informed her lead man of this.[2] She did not report to work the following day, April 26, 1978, but rather went to the emergency room at Deaconess Hospital and contacted Dr. Dominic Costa, M.D. the company physician. Dr. Costa referred her to Dr. Tillman.

She then telephoned Mr. McClure and informed him she could not hear in her right ear and that Dr. Costa had referred her to Dr. Tillman. Mr. McClure told her, "do whatever Dr. Costa says."

On April 27 or 28, 1978, Mrs. Arie was examined by Dr. Tillman who advised her she had a severe hearing loss but that he didn't know exactly what the problem was. He further told her that he did not want her to return to work with the noise level as it was. Later that same night Dr. Tillman called her and referred her to Dr. Aylward. Mrs. Arie called Mr. McClure and reported to him what she'd been told by Dr. Tillman.

Later, on May 9, 1978, Mrs. Arie called Mr. McClure and informed him that she was going into the hospital for surgery by Dr. Aylward. During the course of this conversation Mr. McClure told her that she was a temporary employee and not entitled to sick leave, that she'd signed an agreement to that effect and that no one had ever advised her differently. He told her that if she didn't come back to work he'd have to terminate her. She told Mr. McClure that she couldn't come back to work because she had to have surgery. He replied, "Then I will have to fire you." She also informed Mr. McClure that she was under the impression she was a "full-fledged employee" of Intertherm because she'd been there 90 days, and asked him if he could utilize her in another part of the plant on Gustine Avenue where it wasn't so noisy. Mr. McClure replied that he con-

**2.** The Temporary Employee Handbook requires an employee to report a work related injury to his supervisor immediately and warns that the failure to comply with this reporting procedure may result in a loss of compensative benefits.

sidered all the locations had the same noise level, that there was nothing available for her, and if she didn't come back to work the next day she was fired.

Mrs. Arie did not return to work on the following day, entered the hospital and underwent surgery on May 15, 1978. She was released from the hospital on May 16, 1978.

Mrs. Arie's employment with Intertherm was terminated on or about May 10, 1978. On or about June 8, 1978, Mrs. Arie filed a claim for compensation with the Division of Workmen's Compensation for the injury to her right ear and Intertherm contested the claim, but ultimately entered into a compromise lump sum settlement of the claim for $3,324.00.

Subsequent to termination of her employment with Intertherm, Mrs. Arie, on June 13, 1982, requested a service letter from her former employer. This service letter, dated June 30, 1978, was prepared and signed by Mr. McClure on behalf of Intertherm and gave as the reason for the termination of her employment the following:

"You were terminated May 10, 1978, as having voluntarily quit, because as a temporary employee you did not qualify for a leave of absence."

Intertherm initially contends that the trial court erred when it failed to sustain its motion for a directed verdict because Mrs. Arie failed to establish a submissible case that she was wrongfully discharged for exercising her rights under the Missouri Workers' Compensation Act in that (1) it is not unlawful to dismiss an employee unable to resume work and (2) there was no proof that Mrs. Arie was the object of discriminatory treatment.

■ The first Count of Mrs. Arie's petition is based upon an alleged violation of § 287.780 RSMo.1978, an action under the statute lies only if an employee is discharged "discriminatorily"[3] by reason of exercising his or her rights under the Worker's Compensation Law, and a plaintiff seeking recovery under the statute has the burden of proving the case pleaded. In determining whether evidence in a wrongful discharge action based upon the statute establishes a submissible case, the evidence must be considered in a light most favorable to the employee, and said employee must be given the benefit of all inferences reasonably drawn from the evidence and the defendant-employer's evidence must be disregarded except insofar as it aids or supports the employee's case. *Henderson v. St. Louis Housing Authority,* 605 S.W.2d 800, 803 [1, 2, 3] (Mo.App.1979).

■ However, the mere filing of a claim and subsequent discharge for absenteeism due to a work-related injury creates no cause of action under § 287.780 RSMo.1978, *Rodriguez v. Civil Service Commission,* 582 S.W.2d 354, 356[2] (Mo.App.1979), *Mitchell v. St. Louis County,* 575 S.W.2d 813, 815[2] (Mo.App.1979). A cause of action lies only where the employee pleads and proves that she was discharged for exercising any of her rights under the Worker's Compensation Law. If the evidence demonstrates that the employer had just cause for terminating the employment, other than for the employee's exercise of her rights under the Worker's Compensation Law, then the employee cannot recover under this alternative of § 287.780 RSMo.1978.

■ A contract for personal services, such as the contract in this case, imposes a duty upon the employee to perform the service for which she was hired, and if the employee is unwilling or unable to work the employer may, for that reason, terminate

---

**3.** The statute provides for a cause of action against an employer who *either* discharges an employee *or* discriminates against an employee in retaliation for exercising any rights the employee might have under the Worker's Compensation Law. Discrimination may take the form of denying the employee advancement, salary or hourly pay increases, assignment to less desirous jobs or locations, etc. The term

"discriminatorily," when used in connection with a *retaliatory discharge* under the statute, as it was in *Mitchell v. St. Louis County,* supra, refers to the cause of the discharge, i.e. that the discharge was in retaliation for the employee's exercise of his or her rights under the Worker's Compensation Law and not for some other lawful reason which would justify the employee's discharge.

her employment. *Rodriguez v. Civil Service Commission*, supra, l.c. 356[2]. There is nothing in the Worker's Compensation Law which requires the employer to retain the injured employee when she has recovered from her injuries and is declared able to return to work but cannot or will not perform the duties required by her job. *Mitchell v. St. Louis County*, supra; *Rodriguez v. Civil Service Commission*, supra. The employer's responsibility under the law is to compensate the injured employee for her work-related injury, not guarantee her continued employment despite her inability to perform her duties as an employee.

■ In Missouri the rule is well established that in the absence of a contract for a definite term or a contrary statutory provision, an employer may terminate an employee at any time, without cause or reason, or for any reason and, in such cases, no action can be maintained for wrongful discharge. *Amaan v. City of Eureka*, 615 S.W.2d 414, 415[1] (Mo. banc 1981).

Mrs. Arie's theory of the case was that she was a "permanent employee" because she had worked for Intertherm for more than 90 days and according to the Temporary Employee Handbook, she, having successfully completed the 90 day probationary period, was placed on the permanent seniority list and was entitled to the employee benefits appertaining thereto.

The term "permanent," as used with respect to Intertherm employees is not defined anywhere in the Handbook, although, as noted hereinabove, it is used with reference to a "seniority list." It is also used in connection with those eligible for educational assistance.

■ As a general rule, the term "permanent" when used in an employment contract with reference to the term of employment means nothing more than an indefinite employment, i.e. that the employee is to hold the position until one or the other of the contracting parties shall desire to terminate the connection; in which event the

dissatisfied party is to have the right to be relieved of further obligation to the other upon fair and equitable terms, and after reasonable notice.[4] The term is not to be understood in the sense that the parties are to be bound together by ties which can be dissolved only by mutual consent or for sufficient reason. *Minter v. Tootle-Campbell Dry Goods Co.*, 187 Mo.App. 16, 173 S.W. 4, 7[2] (1915). In such circumstances the contract is terminable at the will of either party and no action will lie for an alleged wrongful discharge.

■ While this is the general rule, it is not without exceptions. One of these exceptions is the statutory imposed restriction against discharging an employee in retaliation for filing of a Worker's Compensation claim, the basis for Mrs. Arie's claim on Count I of her petition.

■ We conclude that Mrs. Arie made a submissible case under the statute. She proved that she sustained an accident arising out of and in the course of her employment with Intertherm on April 25, 1978. At that time she did not know the extent of the injury, but she did experience an excruciating pain in her right ear while hammering with a metal hammer on a metal blower housing. She reported this to her lead man. The following morning she telephoned Intertherm from Deaconess Hospital emergency room within the first four hours of her shift as required by Intertherm's policy as enunciated in its Handbook, and informed Mr. McClure of the incident and that she would not be in for work that day, and that Dr. Costa, the company doctor, had referred her to Dr. Tillman or Dr. Aylward who were specialists in the audio field.

Finally on May 9 or 10, 1978, Mrs. Arie again telephoned Mr. McClure to advise him of her pending hospitalization for surgery on her right ear. It was during the telephone conversation that Mr. McClure, for the first time, informed her that she was a temporary employee and therefore not entitled to sick leave and that she must return

---

**4.** For recent developments in the law see *The Employment-At-Will Issue, A BNA Special Report*, The Bureau of National Affairs, Inc., Washington, D.C. (1982).

to work immediately or she would be terminated "as assumed quit." She offered to return to the workplace if she could work in a quieter part of the plant. Mr. McClure told her that there was no position in a quieter place available. Mr. McClure admitted he took no action to determine if there was any available job for her any place within the corporation.

The Temporary Employee Handbook, in a paragraph entitled *"Employee's Responsibility When Injured On The Job"* states:

"It should be emphasized that light duty is available for all but severely injured employees. Since no employee will lose any portion of his pay as a result of work-related injury, he is expected to report back to work (for light duty, if not fully able to perform his regular duties) immediately after treatment or as indicated by the doctor on the Treatment Authorization Form.

Failure to report as expected above and to insure that the Treatment Authorization Form is returned immediately to his supervisor will make the employee subject to loss of compensation benefits and/or further disciplinary action."

Mrs. Arie's duties, in addition to hammering the metal blower housings, including gluing stickers on panel doors, wiring parts together and wiring panel doors. None of these jobs were noisy. There were quieter areas in the plant than that part of the plant she worked in when using the hammer. The paint area and the warehouse of the plant were less noisy than the assembly line area where Mrs. Arie was working when she injured her ear.

According to Mrs. Arie, three weeks after surgery, which took place on May 15, 1978, she was released by Dr. Aylward, the surgeon who performed the operation on her ear, to seek employment, but the doctor told her that she could not work in a high noise level except if she would have protective devices. Mr. McClure testified that he made no effort to ascertain whether Mrs.

Arie could return to work if she wore a protective device for her ears. Richard Vogt, Mrs. Arie's foreman, testified that during the period in question there was available in the plant hearing protective devices.

During the various telephone conversations Mrs. Arie had with Mr. McClure between April 26th and May 10, 1978, he expressed concern about her injury and encouraged her to follow Dr. Costa's directions. It was not until the telephone conversation of May 9 or 10, 1978, when she advised him of the pending surgery, that any discussion concerning her employment status was had, or when she was required to return to work, or whether she was entitled to sick leave.

The evidence shows that on May 10, 1982, when Mrs. Arie failed to appear for work, Mr. Vogt, her foreman, executed a Personnel Change Order "discharging" Mrs. Arie. Subsequently he and Mr. McClure got together and the word "discharge" was blacked out and an "X" placed in the square for the word "quit" on this form. According to Mr. Vogt when a temporary employee didn't come to work for three days he was authorized to discharge said employee. It was he who initiated the discharge of Mrs. Arie.

Mr. Vogt also testified that he never made any unfavorable reports on Mrs. Arie to Mr. McClure, that she was a good worker, and had no personality problems.

While Intertherm's evidence was that it terminated Mrs. Arie's employment because she was assumed to have quit since she did not report for work on or about May 10, 1978, it did not, as the Temporary Employee Handbook states, invite her to return for "light duty" after her release by the treating surgeons.[5]

There was also evidence which made it clear that Mr. McClure entertained serious doubts that Mrs. Arie sustained a work-related injury as she claimed. Intertherm did

---

5. See 21 ALR 2d 1247, annotation: Right of employer to terminate contract because of employee's illness or physical incapacity.

not file the employer's report of injury with the Worker's Compensation Commission until after a copy of Mrs. Arie's claim for compensation, filed on June 12, 1978, was received by it on June 15, 1978, because it was Mr. McClure's practice not to file a report of injury form unless he knew the claim was "true and just." Because Mrs. Arie had not reported the injury immediately they did not consider that she was injured on the job.

We conclude that it was a jury question whether Mrs. Arie was discharged in retaliation for her filing of a Worker's Compensation Claim, and hold that there is no merit to Intertherm's claim that Mrs. Arie did not make a submissible case under § 287.780 RSMo.1978.

 Intertherm's next Point Relied On is that the trial court erred in permitting Mrs. Arie to testify over objection that she had been hired as a permanent employee because this was an impermissible attack upon her signed contract of employment wherein she agreed that her employment was temporary.

The "Employment Agreement," which Mrs. Arie conceded she signed when she was hired by Intertherm stated that she agreed to temporary employment under the terms and conditions outlined in the agreement. Among these conditions was that the position was temporary; her rate of pay would be less than pay for full time employment; the job would last no longer than six months from the date of hiring; that she would not be eligible for permanent employment; that when her temporary employment ended she'd have no recall rights; that her rate of pay would be the only privilege of her employment, and she would not be entitled to or receive seniority rights or any fringe benefits such as, but not limited to, vacations, insurance of any kind, paid funeral leave, or the right to bid on premium jobs or transfer to a different department.

During Mrs. Arie's testimony in the trial court her counsel questioned her concerning the circumstances surrounding the Application for Employment with Intertherm and her interview with Mr. McClure on January 16, 1978. When inquiry was directed to what was said about the type of employment she would have "as far as length of time, temporary, full time, or whatever?", Intertherm's counsel objected that this evidence was in violation of the parol evidence rule in that it was an attempt to vary the terms of the written agreement under which Mrs. Arie was employed. During a discussion at the Bench the trial court overruled the objection and advised Intertherm's counsel that the objection could be a continuing one, an offer Intertherm's council accepted.

Mrs. Arie then testified that during the interview preceeding her signing of the "Employment Agreement" Mr. McClure told her that she would be a temporary employee for 90 days on a trial basis and then she'd have all the rights of a full time employee.

Later, during her testimony, she identified the Temporary Employee Handbook and testified that it was given to her by Mr. McClure the day she was interviewed and hired. He told her these were the rules and regulations of Intertherm and for her to read it over.

She further testified that she had not read the "Employment Agreement" prior to signing it and that this was because she was told by Mr. McClure that everything in "these papers" had been discussed during the interview and that all she had to do was sign the contract. Relying on Mr. McClure's statement, she executed the contract without reading it. According to her testimony there had been no discussion about any six months temporary employment during the pre-employment interview.

The issue before the trial court was whether the "Employment Agreement" which Mrs. Arie admittedly executed was the contract she assented to with Intertherm. The evidence to which Intertherm objected as violation of the parole evidence rule went to the question whether the "Employment Agreement" was the contract between the parties.

Generally, the parol evidence rule presupposes this existence of a legally effective written instrument, and where, as in this case, the question in issue is whether the written instrument is, in fact, the contract assented to by the parties, the parol evidence rule does not apply. *City-Wide Asphalt Co., Inc. v. E.E. Scott Construction Co.,* 610 S.W.2d 330, 336[5] (Mo.App.1980); *Smith v. Worsham,* 552 S.W.2d 367, 371[5] (Mo.App.1977). Said rule applies only in these cases where the parties to an agreement, reduce it to writing, and agree or intend that such writing shall be their agreement. *Warinner v. Nugent,* 362 Mo. 233, 240 S.W.2d 941, 944[3] (Mo.1951). We hold that the parole evidence rule was inapplicable in this instance.

With respect to the admission into evidence of the Temporary Employee Handbook, Intertherm's objection at trial was that it was "not relevant and it contravenes the parol evidence rule, and because it's been established that she did, in fact, sign a temporary employment agreement which on its face shows that she was distinct from the employees covered in the Employees Handbook, page 2."

We have already disposed of the parol evidence question hereinabove and hold that it is inapplicable here for the same reasons heretofore stated with respect to Mrs. Arie's testimony.

 We further conclude that the admission of this Handbook was not error because it supported Mrs. Arie's contention that she was hired as a permanent employee, since, according to Mr. McClure's testimony, this Handbook was given to permanent employees only.

 Although we have found no Missouri appellate decision so holding, we believe the giving of the Handbook to the newly hired employee created a fact issue for the jury to decide the terms of her employment.

The title of the Handbook itself was misleading or at least ambiguous. Its purpose was to establish personnel policies or practices which would enhance the employee-employer relationship. It made no reference to temporary employees and the term "permanent" was used only twice in the Handbook, and then in connection with educational assistance available to "permanent full time employees," and in that section of the Handbook dealing with the "Probationary Period" where it is stated that all production employees who, at the end of 90 days meet shop requirements through their own abilities will be placed on the "permanent seniority list" as of the original date of employment.

Throughout the Handbook the term "employee," "hourly employee," "all employees," "every employee," "any employee" are used. Nowhere is there any definition of the term "temporary employee" or "permanent employee" contained in the Handbook. Nowhere in the Handbook does it state that its contents do not apply to persons temporarily employed. It is clear that many of the policy statements and work rules apply to all employees of Intertherm; e.g. attendance, work rules, punctuality, work performance, etc.

 We believe that, where as here, upon the hiring of an employee said employee is given a handbook containing policy statements of the employer and rules of employment there arises contractual rights in the employee without evidence that the parties mutually agreed that the policy statements would create contractual rights in the employee, and this despite the fact the statement of policy is not signed by the parties and could be unilaterally amended by the employer without notice to the employee, and contains no reference to any specific employee, his job description or compensation.

Although Intertherm was under no obligation to establish personnel policies or practices, having chosen to do so and having made them known to its employees, the employment relationship was thereby presumably enhanced. Mrs. Arie was not only given the Handbook but was told to read it. Under these circumstances we conclude that the Handbook was admissible and that the jury could consider its statements to

find for Mrs. Arie on her legitimate expectations grounded on Intertherm's written policy statements set forth therein. *Toussaint v. Blue Cross and Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880, 885[6] (Mich.1980).

We believe the jury could find that the contract she intended signing was one for permanent employment and the Handbook specified that after 90 days with her employer she would be put on the permanent seniority list; that this provision in the Handbook, considered with the ambiguous title of same, could give rise to a reasonable expectation that she attained permanent employee status at the end of the 90 days of employment; that it was admitted by her superior there had been no complaints concerning the performance of her duties; that she commenced her employment with Intertherm on January 16, 1978, and worked until the date of her injury, April 24, 1978; and that she was not discharged by Intertherm until May 10, 1978, more than 114 days after she entered its employ, and therefore, she became a permanent employee prior to her discharge and was entitled to the fringe benefits of such employee status.

We therefore rule this Point against Intertherm.

Intertherm next complains that the trial court erred when it permitted one of Mrs. Arie's witnesses, Mildred Lutes, a fellow employee, to testify over objection, that she suffered from an ear disease while in Intertherm's employment. The basis of the objection to Mrs. Lute's testimony concerning a hearing problem she suffered—"Menier's disease"—while employed by Intertherm was "not relevant."

Mrs. Lutes advised Mr. McClure of this condition and went on sick leave for five months and never returned to her employment with Intertherm because she was advised not to because of the loud noises. Mrs. Lutes further testified that when she was hired on January 23, 1978, she was hired as a temporary employee for a period of six months by Mr. McClure but she had no recollection of signing an Employment Agreement like that Mrs. Arie admitted

signing. She was under the impression that she would be there six months and if her work record was satisfactory, and she performed her work satisfactorily, she would be put on the permanent seniority list and would be entitled to all the benefits, including hospitalization.

Evidence is relevant if it tends to prove or disprove a fact in issue, or to corroborate evidence which is relevant and which bears on the principal issue. *Mercantile Trust Company, N.A. v. Harper,* 622 S.W.2d 345, 352 (Mo.App.1981).

Mrs. Lutes' testimony was relevant to Mrs. Arie's discharge in that it allowed the jury to compare and contrast the treatment of a temporary employee with that accorded Mrs. Arie. Mrs. Lutes' situation paralleled in many respects that of Mrs. Arie; the significant distinction between the two employee's plight being Mrs. Arie's exercise of her Worker's Compensation rights, when she was not allowed a leave of absence as was Mrs. Lutes, who made no claim that her ear problems were work related.

We hold the trial court did not err in admitting Mrs. Lutes' testimony on the grounds it was not relevant.

Intertherm, under this Point, also contends that the trial court erred in sustaining Mrs. Arie's objection to its attempt to prove its compliance with OSHA noise level standards "in an attempt to reduce the error" occasioned by Mrs. Lutes' testimony concerning her ear problems.

It is clear from the evidence that Mrs. Lutes' testimony was that her condition was a degenerative one not associated with the noise levels within which she performed her duties for Intertherm. Since Intertherm offered this evidence for the purpose stated, it was totally irrelevant and properly excluded.

We hold the trial court did not err in either instance as claimed by Intertherm.

The next error alleged by Intertherm is that the trial court erred in overruling its objection to the reading of § 287.380 RSMo.

1978, to the jury during re-direct examination of Mr. McClure because by so doing the impression was created that it was in violation of Missouri law.

█ The objection interposed at trial by Intertherm's trial counsel to the reading of the statute was non-specific, in general terms, and therefore this Point has not been properly preserved for appellate review. *State ex rel West v. Diemer,* 255 Mo. 336, 164 S.W. 517, 521[3] (Mo.1914); *McIlroy v. Hamilton,* 539 S.W.2d 669, 675[8] (Mo.App. 1976). We hold, therefore, that we may not review this Point and rule it against Intertherm.

█ Intertherm also contends that the trial court erred in overruling its objection to Mrs. Arie's trial counsel's argument asking the jury to infer that it had deliberately withheld probative evidence in that it failed to call as a witness one of its employees, John Sullivan, as a witness in the absence of any showing that he possessed any relevant evidence and was equally available as a witness to Mrs. Arie.

There is evidence in the transcript of the testimony at trial that Mrs. Arie consulted with Mr. Sullivan, who was employed in Intertherm's personnel department, concerning her employment status with the company sometime between the date on which she commenced her employment and she sustained the injury to her ear. Mrs. Lutes corroborated Mrs. Arie's testimony in that at least between January and May 1978, Mr. Sullivan was employed in the personnel department of Intertherm at the Gustine Avenue plant and that he had an office there. She also testified that she discussed with him Mrs. Arie's employment status during that period and the difference between her and Mrs. Arie's employment status, she being a temporary employee and Mrs. Arie a permanent employee.

The rule of law in Missouri on this issue is that before any adverse inference can be drawn from the failure of a party to call a witness, the party attempting to argue such inference must show that the missing witness had knowledge of pertinent facts and was qualified to testify concerning the facts in issue. *Sciortino v. MacGee,* 633 S.W.2d 134, 136[3] (Mo.App.1982).

We believe Mrs. Arie established the fundamental basis for the application of this rule and hold that the trial court did not err in overruling Intertherm's objection to this line of argument.

Intertherm complains also that the trial court erred in failing to sustain objection of counsel for Mrs. Arie's argument that persons, like Mrs. Arie, who were hired as temporary employees were so employed so that they could be fired for no reason and be denied Worker's Compensation benefits.

In context, this argument was directed at the "Employee Agreement" Intertherm claimed was the employment contract between the parties for a six month period only, and was an attempt to point out why this form of contract was used by Intertherm. Mrs. Arie's counsel was arguing the benefits accruing to Intertherm; the right to fire an employee without cause, the avoidance of furnishing these employees with the fringe benefits afforded the permanent employees, and, as her counsel explained the avoidance of paying the difference between Worker's Compensation and the employee's regular wages as stated in the Handbook.

From the terms of the objection it is clear that Intertherm's counsel construed a part of his opponent's argument to state that by the agreement Intertherm could deprive employees hired thereunder of Worker's Compensation benefits for job related injuries because the objection was "... That's a false statement of law." If this could be inferred from the argument it was immediately clarified when Mrs. Arie's counsel retaliated that when somebody no longer works for the corporation and haven't been injured they may not claim Worker's Compensation. Counsel did not misstate the law.

The trial judge so construed the argument and we agree that in construing it thusly, the trial judge was not guilty of error.

This holding also disposes of Intertherm's contention that the trial court erred in not instructing the jury to disregard this portion of the argument.

The next Point Relied On is that the trial court erred (1) when it sustained Mrs. Arie's objection to cross-examination concerning her post-termination earnings; (2) when it submitted the issue of the assessment of actual damages to the jury because (a) Mrs. Arie did not prove any actual damages accrued as a consequence of her discharge and (b) in any event, cross-examination on this question was permissible to reduce its liability.

This incident took place after Mrs. Arie responded to a question as to when she first secured employment following her termination by Intertherm that she was next employed in January, 1979, at the Saum Hotel. She further testified on cross-examination that she worked at the hotel until the following June earning $80.00 per week plus tips, which averaged $10.00 to $15.00 a week. The owner closed the restaurant in the Saum for about a month and, after it reopened under new management, she returned and worked for a few months and was laid off. She was then asked where she worked after the Saum and replied, "... I went to J.J.'s on Kingshighway."

At this point her counsel objected on the grounds that, "I think only the most recent employment after the termination at Intertherm would be relevant. Any further employment would be immaterial and irrelevant to any issue before this court."

When asked the purpose of the query, Intertherm's counsel replied: "Goes to the question of actual damages your honor. If he's content with the first employment after termination. . . ."

The trial court then sustained the objection because, since Mrs. Arie had admitted she'd never been asked to display the service letter, such evidence was immaterial.

■ Since appellant made no offer to proof at trial as to what the witness would

have answered, there was nothing preserved for review on appeal. *United States Fire Insurance Company v. Madesco Inv.,* 573 S.W.2d 442, 443 (Mo.App.1978); *Madget v. Jenkins,* 461 S.W.2d 768, 772 (Mo.1970).

> An objection to the exclusion of testimony cannot be considered on appeal in the absence of a showing of what the testimony would have been and that it was relevant and material. (citations) The mere refusal to allow a witness to testify is not reversible error in the absence of a showing of what the answer would have been. (citations) It is also the rule that reversible error cannot be predicated on the exclusion of a proper question where there is no offer of proof that the answer would have been in favor of the complaining party. (citations)

*Thayer v. Sommer,* 356 S.W.2d 72, 80 (Mo.1962).

■ We hold that there was no error under these circumstances in the trial court's sustaining the objection to this evidence.

■ Intertherm next claims error in the submission of actual damages to the jury because, as it contends, Mrs. Arie did not show that any actual damages accrued as a consequence of her termination.

This attack is necessarily directed against Count I of Mrs. Arie's petition and we find no merit in it.

There is evidence from which the jury could find that at the time Mrs. Arie sustained her injury she was earning a minimum of $4.67 per hour;[6] that she was off of work from April 26, 1978, until she was terminated on May 10, 1978, and that she remained unemployed until sometime in January, 1979, when she went to work at the Saum Hotel where she earned a flat salary of $80.00 a week plus $10.00 to $15.00 a week in tips. We believe this evidence, in the absence of any evidence that Mrs. Arie could have been employed any earlier, is sufficient for submission of her claim for damages as a consequence of the termination of her employment with Intertherm.

---

**6.** Mrs. Arie also testified that she received some raises during the course of her employment; however, she never testified to the amount of these raises.

The final contention under this Point is that cross-examination with respect to post-termination earnings was permissible to reduce Intertherm's liability. What we have previously said with regard to this subject is equally applicable here, and we hold that the trial court did not err as Intertherm claims.[7]

Intertherm's next Point Relied On is that the trial court erred when it failed to grant its motion for directed verdict on Count II of Mrs. Arie's petition because she failed to make a submissible case that the service letter was false and was consistent with her admission and the facts addressed relating to her termination.

We disagree. The service letter stated that Mrs. Arie was terminated ". . . as having voluntarily quit, because as a temporary employee you did not qualify for a leave of absence."

Viewing the evidence most favorable to Mrs. Arie we hold that there was evidence from which the jury could reasonably find that Mrs. Arie did not "voluntarily quit" but, rather, was discharged in retaliation for exercising her Worker's Compensation rights as we have held in ruling on the question whether she made a submissible case under Count I of her petition.

Whether the trial court erred in sustaining Mrs. Arie's objections to cross-examination of her concerning admissions made by her during her deposition concerning the cause of her termination is the next issue presented for review.

The "admissions" referred to in this Point refer to answers made by Mrs. Arie during her deposition when she was asked what was inaccurate in the service letter her employer had furnished her and she replied that she was not going to interpret the letter and that she did not feel that she was qualified "to decide what is right or what is

wrong at this time," and that she chose not to answer the question. When asked if the service letter was truthful or untruthful in any manner she responded, "I don't know." When pressed further to answer the question Mrs. Arie responded, "If I felt qualified to answer your question, I would answer it. Under the circumstances I can't give you an answer." This entire portion of the deposition was taken subject to objection by Mrs. Arie's attorney on the grounds that the questions called for a legal conclusion which Mrs. Arie was not qualified to answer. No ruling on these objections to the deposition testimony was obtained prior to trial. The trial court sustained the objections on the ground that it was an "improper use of the deposition."

It is Intertherm's position that it should have been permitted to impeach Mrs. Arie by these prior inconsistent answers contained in her deposition.

The general rule in Missouri is that a deposition which is admittedly accurate, like any other parol statement, may be used for purposes of impeachment of the deponent-witness. Rule 57.07(a)(1). *Coulter v. Michelin Tire Corporation,* 622 S.W.2d 421, 433[22] (Mo.App.1981); *Schwartz v. Fein,* 471 S.W.2d 679, 682[7] (Mo.App.1971).

When, as here, objections were imposed at the taking of the deposition and the witness answers over objection, it would seem incumbent upon one intending to employ the deposition for impeachment to request a ruling on the objections either prior to trial or at some time during trial when time can be made available by the court without delaying the trial's progress. The trial judge, we believe from his statement in the record, decided the objections should have been taken up and ruled on at some other more appropriate time rather than delaying until Mrs. Arie was called as a

---

7. Intertherm in the Argument portion of its brief attempts an attack on Instruction No. 10, an M.A.I. 4.01 damages instruction submitted by Mrs. Arie and read to the jury, on the grounds that it gave no guidance to the jury how to calculate the damages and offsetting interim earnings. The Point Relied On does not specifically attack the instruction, but, presents for our review the sufficiency of Mrs. Arie's evidence to support the submission. For this reason we hold that the argument made by Intertherm directed against the Instruction was not the issue presented in the Point Relied On and we do not afford it review. Rule 84.04(d).

witness in Intertherm's case, subsequent to testifying in her own case.

Under these circumstances we conclude that the trial judge exercised his discretion appropriately and rule this sub-Point against Intertherm.

■ At trial Intertherm offered into evidence a certified copy of the record of the Division of Employment Security of the Deputy's Determination relative to a claim for unemployment benefits by Mrs. Arie but an objection to its admission into evidence on the ground it was "irrelevant, immaterial, (sic) invades the province of the jury," was sustained.

The theory upon which Intertherm contends this document was admissible, as stated in its Point Relied On, is that it constitutes a judicial admission by Mrs. Arie or is relevant evidence which should have been before the jury.

The argument in support of this sub-Point consists of five lines and one case citation, *Wuederman v. J.O. Lively Construction Company,* 602 S.W.2d 215, 221 (Mo.App.1980). We find the Wuerderman case does not control under the circumstances in this case, because in that case the corporate defendant failed to object when the plaintiff testified about the unemployment form defendant submitted to the Kansas Employment Security Division and its contents and therefore waived any objection it might have. Furthermore, the document in the Wuerderman case was a form filled in by one of defendant's agents in its behalf; such is not the case here.

We hold that the trial court did not err in sustaining the objection to admitting this Deputy's Determination into evidence.

■ Intertherm's next Point Relied On is that "The trial court erred when it submitted the issue of punitive damages to the jury on Counts I and II because respondent did not present substantial evidence supporting her claim for punitive damages." This preserves nothing for review, *Tripp v. Harryman,* 613 S.W.2d 943, 950[12] (Mo. App.1981), and is in violation of Rule 84.-04(d) because it fails to state "wherein" there was no substantial evidence to authorize the submission of the punitive damage issues to the jury.

We therefore rule this Point against Intertherm.

Intertherm, with leave of court, and after oral argument filed a supplement to its brief in which it contends that the enactment of § 290.140 RSMo. 1982, whereby the General Assembly precluded any award for punitive damages in those cases when the employer has furnished the employee a service letter pursuant to the statute.

The issue, simply stated is whether the statute whose effective date was August 13, 1982, must be applied retroactively to bar recovery of punitive damages for a service letter written June 30, 1978, and an action on the service letter statute, tried in May, 1981.

Intertherm argues that since punitive damages are penal in nature § 1.160 [8] is controlling and § 290.140, as repealed and re-enacted, must be given retroactive effect. We disagree.

Article I, Section 13 of the Constitution of Missouri, 1945, prohibits the enactment of ex post facto laws, that is laws affecting substantive or vested rights. *State ex rel. St. Louis-San Francisco Railway v. Buder,* 515 S.W.2d 409 (Mo. banc, 1974). The Court said, l.c. 411:

"It is best to keep in mind that the underlying repugnance to the retrospective application of laws is that an act or transaction, to which certain legal effects

---

8. "No offense committed and no fine, penalty or forfeiture incurred, or prosecution commenced or pending previous to or at the time when any statutory provision is repealed or amended, shall be affected by the repeal or amendment, but the trial and punishment of all such offenses, and the recovery of the fines, penalties or forfeitures shall be had, and all respects, as if the provision had not been repealed or amended, except . . . ; and (2) that if the penalty or punishment for any offense is reduced or lessened by any alteration of the law creating the offense, the penalty or punishment shall be assessed according to the amendatory law."

were ascribed at the time they transpired should not be subject to a different set of effects which alter the rights and liabilities of the parties thereto."

Under Missouri law punitive damages are never allowed as a matter of right, *DeBow v. Higgins,* 425 S.W.2d 135, 143[12] (Mo.1968). They are not compensatory but are imposed for the sole purpose of punishment and deterrance to prevent the alleged wrongdoer and others from engaging in the same kind of conduct. *State ex rel Smith v. Greene,* 494 S.W.2d 55, 60[6] (Mo. banc 1973).

Mrs. Arie relies on §§ 1.170 and 1.180. According to § 1.170 the repeal of any statutory provision does not affect any act done or right accrued or established in any proceeding, suit or prosecution, had or commenced in *any civil case* previous to the time when the repeal takes effect; but every such act, right and proceeding remain as valid and effectual as if the provision so repealed had remained in force. § 1.180 provides that no action or plea, pending at the time any statutory provisions are repealed, shall be affected by the repeal; but the same shall proceed, in all respects as if the statutory provisions had not been repealed, except that all proceedings had after the repeal becomes effective are governed by procedural rules and laws then in effect, insofar as they are applicable.

Whenever the legislature repeals an existing statute it is considered to have done so in contemplation of the general savings clause as in §§ 1.170 and 1.180, and unless the legislature specifically makes the re-enacted statutes retroactive, it is presumed that the savings clauses hereinabove stated are to be incorporated by reference with the same effect as if the repealing statute contained its own special savings clause. *Protection Mutual Insurance Company v. Kansas City,* 551 S.W.2d 909, 911[2] (Mo.App.1977).

Neither party to this appeal has cited us any Missouri cases deciding this question, and our research has failed to bring forth any. Our research has, how-

ever, surfaced three cases where legislation precluding punitive damages in a situation akin to that we have before us where the courts held that prior to entry of judgment no plaintiff has a vested right to punitive damages and a statute precluding an award of punitive damages may constitutionally be applied retroactively; however, once the plaintiff has had a judgment awarding him punitive damages he has a "vested right" in said punitive damages and cannot be deprived of the punitive damages by retroactive application of a statute precluding an award of punitive damages which was enacted and took effect after the entry of judgment. *Louisville and N.R. Co. v. Street,* 164 Ala. 155, 51 So. 306, 307 (1910); *Kelly v. Hall,* 191 Ga. 470, 12 S.E.2d 881, 883[3] (Ga.1941); *Smith v. Hill,* 12 Ill.2d 588, 147 N.E.2d 321, 325[8] (Ill.1958).

We believe that in a civil case, as this is, §§ 1.170 and 1.180 are controlling and when a judgment awarding Mrs. Arie punitive damages was entered in the Circuit Court of the City of St. Louis on August 10, 1981, she acquired a vested interest in said award and could not be deprived of her rights in said judgment by the repeal and re-enactment of § 290.140 which did not take effect until August 13, 1982, almost one year later.

We therefore hold that under the facts presented § 290.140, as re-enacted, may not be applied retroactively, in this case.

Intertherm's final Point Relied On is that the trial court erred in overruling its motion for directed verdict on Count II of Mrs. Arie's petition because the Missouri Service Letter Statute is unconstitutional.

This constitutional issue has already been decided adversely to Intertherm's position. *Hanch v. K.F.C. National Management Corporation,* 615 S.W.2d 28, 33, 36[5–13] (Mo. banc 1981); *Rimmer v. Colt Industries Operating Corporation,* 656 F.2d 323, 327 (CA 8, 1981).

Judgment affirmed.

SMITH and PUDLOWSKI, JJ., concur.