Larry **HOPKINS, Respondent,**

v.

**TIP TOP PLUMBING AND HEATING COMPANY, Appellant.**

**No. WD 42394.**

Missouri Court of Appeals, Western District.

Jan. 29, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 5, 1991.

Application to Transfer Denied April 9, 1991.

Jerome T. Wolf, Kansas City, for appellant.

J. Michael Rumley, Kansas City, for respondent.

Before KENNEDY, P.J., and SHANGLER and GAITAN, JJ.

SHANGLER, Judge.

The plaintiff Larry Hopkins brought an action against Tip Top Plumbing and Heating Co. for wrongful discharge from employment for the exercise of rights under the Workers Compensation Law. § 287.780, RSMo 1986. The jury awarded the plaintiff $46,681 and judgment was entered on the verdict. The appeal is from that judgment.

The plaintiff Hopkins was employed by Tip Top as a plumber from September of 1985 until January 20, 1987. Tip Top was a union shop and so Hopkins became a member. In January of 1987 he was paid the $16.92 per hour union-negotiated wage. He worked mostly with copper pipes, which he cut and then soldered with lead flux to connect onto water lines.

On December 31, 1986, Hopkins blacked out while on a job site and was taken to a hospital. The preliminary diagnosis was lead poisoning. He was released from the hospital after several days and was placed on medication to control seizures and blackouts. The physician advised that he avoid work with copper or flux that might emit lead fumes, and that he not drive for 90 days. Hopkins continued treatment after release while his physician awaited the test results required to make a definite diagnosis of his condition.

Hopkins remained at home for several days after the release, and returned to work on January 7, 1987. He informed the jobsite foreman, Goffro, of the medical restrictions as to exposure to lead fumes and the foreman assigned him tasks that did not involve such exposure. It was the policy of the employer, in order to ensure the safety of coworkers, that an employee injured on the job bring a doctor's release to either field superintendent Hazelwood or company president Ladd before returning to work. Hopkins did not contact either Hazelwood, who was on vacation when he returned to work, or Ladd before he resumed work. Nor did Hopkins have a written release.

Hopkins continued on the job until January 20 when field superintendent Hazelwood handed him an envelope and told him he was fired. Hazelwood had returned from vacation some days before and discovered that Hopkins did not have a written medical release. Hazelwood mentioned the subject of a doctor's release to Hopkins, but could not recall the extent of that conversation. Hopkins asked why he was being fired, but Hazelwood didn't know and referred Hopkins to Ladd, president of Tip Top, for the explanation. Hopkins talked with Ladd on that day or on the next day, January 21. Ladd told Hopkins that the discharge had nothing to do with his work but all to do with his health. Hopkins testified that "[i]t was entirely my health condition, and the fact that I exercised my right for Workers' Compensation. Furthermore, [Ladd] stated that he had too may claims against Worker's Compensation already and his premiums were entirely too high to start with." Ladd also told Hopkins that "at that time he had already had one man killed on the job, he had two men injured, and he could not afford to take a chance of any more claims against Tip Top on Workers' Comp." Hopkins acknowledged that Ladd never told him "directly" that "he was being terminated for filing a Workers' Comp claim." Nor had Hopkins yet at the time he was fired filed a formal claim for workers' compensation or consulted a lawyer to that end.

Ladd did not recall whether he told Hopkins that he "couldn't afford to have any more Workers' Compensation claims against Tip Top", but that it was "possible." He did not tell Hopkins that one

worker had been killed and two men maimed and that the insurance premiums were already too high. On the day Hopkins was terminated, January 20, nevertheless, Ladd knew that Hopkins "had been off on a Workers' Compensation claim." Hopkins acknowledged that Ladd told him then that he would be "tickled to death to put [Hopkins] back to work" as soon as he received a "clean bill of health" from his doctor.

On January 24 or 25, a few days after the termination, the treating physician placed Hopkins on total disability and instructed him not to work at all until April 1. On that date the physician released him for work without restriction. Hopkins considered himself fired and did not return to Tip Top. Instead he called the union hall because it was customary for unemployed union members to get jobs that way. Hopkins was told by the union that Tip Top was not hiring, and so he accepted the first available work—with Rodriguez Mechanical—even though it was temporary. He worked there from May 1 until August 19 and at the same wage paid by Tip Top, $16.92 per hour. After that job ended, Hopkins attempted to find other employment through the union, even with Tip Top. He was then expelled from the union because he could not pay dues, and thereafter Hopkins sought nonunion plumbing jobs, but work was not available. In July of 1988 Hopkins obtained work as an insurance salesman and continued in that employment at the time of trial.

 Tip Top contends for its first point on appeal that the trial court erred in the denial of its motion for directed verdict at the close of plaintiff's evidence because Hopkins failed to prove a submissible case. In the recapitulation of that argument Tip

Top accords to the plaintiff only the favorable inferences of its case-in-chief. Tip Top tendered evidence upon denial of that motion, however, and thus waived appellate review of that trial action. *Polovich v. Sayers*, 412 S.W.2d 436, 438 (Mo.1967). Tip Top also moved for a directed verdict at the close of all the evidence. What is preserved for appellate review—and what Hopkins understands the point to intend— is the sufficiency of the evidence at the conclusion of all the evidence to submit the claim of discriminatory discharge for the exercise of right under § 287.780, RSMo 1986. In that determination we consider the inferences most favorable to the employee from all the evidence and disregard the evidence of the employer except as it sustains the case of the employee. *Henderson v. St. Louis Hous. Auth.*, 605 S.W.2d 800, 802 (Mo.App.1979). The burden to prove a claim under the statute, of course, rests on the employee. *Craig v. Thompson*, 244 S.W.2d 37, 42 (Mo. banc 1951).

There are four essential elements to the cause of action that § 287.780 [1] invests:

(1) plaintiff's status as an employee of the defendant before the injury

(2) plaintiff's exercise of a right under chapter 287

(3) discharge of or discrimination against the employee by the employer

(4) an exclusive causal relationship between plaintiff employee's actions and defendant employer's actions

*Hansome v. Northwestern Cooperage Co.*, 679 S.W.2d 273, 275 (Mo. banc 1984).

Tip Top does not dispute the sufficiency of the proof of the first two elements. The employer "questions" that the third was met,[2] but presses only the contention that it was the failure to prove the fourth ele-

---

**1.** Section 287.780 provides:

*No employer or agent shall discharge or in any way discriminate against any employee for exercising any of his rights under this chapter. Any employee who has been discharged or discriminated against shall have a civil action for damages against the employer.*

**2.** Tip Top argues parenthetically that, whatever the terminology of the testimony, its removal of Hopkins from the job was not a true "termi-

nation" or "discharge," but the observance of the prudent employer policy that a worker injured on the job remain off work until release by the doctor. It was a procedure applied uniformly to all employees and so could not have been a discrimination when Hopkins was "taken off the job." This argument, as does virtually the entire exposition of the first contention of trial error, *neglects the impact of the inferences* unfavorable to the employer.

ment—an exclusive causal relationship between the exercise of right under the statute and the discharge from employment—that defeats the submissibility of the claim. It is the argument that in those cases where a submissible issue of discriminatory discharge under § 287.780 was made out, the exercise of right to workers' compensation occurred prior to the discriminatory action of the employer. *See, e.g., Hansome v. Northwestern Cooperage Co.,* 679 S.W.2d at 275; *Wiedower v. ACF Industries,* 715 S.W.2d 303 (Mo.App.1986); *Russell v. United Parcel Serv.,* 666 F.2d 1188 (8th Cir.1981). In this case, Tip Top argues, the proof of exclusive causal relationship between the employee's exercise of right and the employer's act of termination fails because "[Hopkins] was pulled off the job [only] because he did not have a doctor's release to go back to work."

The argument, as before, remains tendentious and indifferent to the inference that Hopkins was fired because he had suffered a compensable injury and was in the exercise of his rights under the Workers' Compensation Law. The evidence that Ladd knew at the time he terminated Hopkins from employment that Hopkins "was off because he was hurt on the job," that Ladd told Hopkins he was fired because he was exercising his rights under the Workers' Compensation Law, and that his premiums were already too high so that "he could not afford to take a chance on any more claims on Workmen's Comp," that Ladd acknowledged that it was "possible" that he could not afford to have any more such claims against Tip Top—all are probative of an exclusive causal relationship between the exercise of right by the employee under § 287.780 and the discharge by the employer.

■■■ It is indeed the principle that the Workers' Compensation Law is designed to compensate an employee for job-related injury, and not to ensure job security. *Davis v. Richmond Special Rd. Dist.,* 649 S.W.2d 252, 255 (Mo.App.1983). Thus, the fact alone that a discharge follows the filing of a compensation claim for a work related injury does not prove a cause of action under § 287.780. *Rodriguez v. Civil Serv. Comm'n,* 582 S.W.2d 354, 356 (Mo.App. 1979). There must be also a demonstrable exclusive causal relationship between the exercise of right and the discharge or other discrimination. *Hansome v. Northwestern Cooperage Co.,* 679 S.W.2d at 275. Thus, if the evidence proves that the employer had just cause to terminate the employment other than for the exercise of right by the employee under the Workers' Compensation Law, then the employee does not recover under § 287.780. *Arie v. Intertherm, Inc.,* 648 S.W.2d 142, 149[4] (Mo.App.1983).

Hopkins sufficiently proved the elements of a claim of discriminatory discharge under § 287.780. It was left to Tip Top to show that there was nevertheless a legitimate cause to discharge the employee other than for any exercise of right under the Workers' Compensation Law. It is for the jury then to assess whether the cause attributed by the employer was pretext, rather, and to return a verdict accordingly. *Wiedower v. ACF Indus.,* 715 S.W.2d 303, 307[8] (Mo.App.1986). Tip Top argues the inferences from its evidence as fact so conclusive as to determine the issue of submissibility against Hopkins as a matter of law. It was for the jury to believe or reject the evidence for Hopkins that he was fired to retaliate for his exercise of right under the law and to accept or discard as pretext the evidence for Tip Top that Hopkins was not fired, but "pulled off the job," because he did not present a doctor's release and that he would be put back to work when the release was presented.

■■■ The second point of error reposits the first point, but with a new emphasis. It likens a claim of discriminatory discharge under § 287.780 to a claim of employment discrimination under Title VII of the Civil Rights Act of 1964. The allocation of the burden of proof under the federal act requires not only that the plaintiff prove a discrimination prima facie, but also that upon a showing by the defendant of some legitimate, nondiscriminatory reason for the rejection of the employee, the plaintiff show that the reason assigned by the

defendant was pretext. In this scheme as articulated by the cited federal decisions, once the defendant adduces a nondiscriminatory reason for the rejection of the employee, the plaintiff can meet the ultimate burden of proof only by evidence that the reason given by the defendant is pretext for the prohibited discrimination. Tip Top argues for a like method of proof of a claim under § 287.780.

It is almost enough to say that the disparity in the public purpose of each enactment is so evident as to explain the disparity in the legal rules of proof that implement them. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253[2], 101 S.Ct. 1089, 1094[2], 67 L.Ed.2d 207 (1981) and *Henderson v. St. Louis Hous. Auth.,* 605 S.W.2d at 803. In a Title VII case the progressive "allocation of burdens" is intended "to sharpen the inquiry into the elusive factual question of intentional discrimination." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. at 255 n. 8, 101 S.Ct. at 1094 n. 8. In a claim under § 287.780 the factual question is frank and not elusive. It is sufficiently proven prima facie by the testimony of the plaintiff alone that the defendant told him that he was fired for exercising rights to workers' compensation. *Hansome v. Northwestern Cooperage Co.,* 679 S.W.2d at 275. Evidence by the defendant that the discharge was for cause and so legitimate, or then by the plaintiff that the cause assigned was only pretext—if before the jury—is for that trier to accept or reject by verdict. *Wiedower v. ACF Indus., Inc.,* 715 S.W.2d at 308[5].

■ The third point on appeal contends as trial error the submission of Instruction No. 5 to the jury. That instruction directs a verdict if the jury believe:

First, that plainif, while employed by the defendant, exercised certain of his rights under the Workers' Compensation Law by receiving medical treatment and remaining off work until released by his doctor to return to work, and
Second, as a direct and exclusive result of plaintiff exercising said rights, or either of them, under the Workers' Compensation Law, defendant discharged plaintiff, and
Third, as a direct result of such discharge plaintiff sustained damage.

MAI contains no form for the submission of the private cause of action that § 287.780 creates. The verdict director tendered by Hopkins and submitted to the jury follows the model approved for such a claim in *Blair v. Steadley Co.,* 740 S.W.2d 329, 331 (Mo.App.1987). The propositions that compose the verdict director approved in *Blair* are the substantive elements of the cause of action under § 287.780 as delineated by our Supreme Court en banc in *Hansome v. Northwestern Cooperage Co.,* 679 S.W.2d at 275. Tip Top does not dispute the structure of the submission is valid, but argues that proposition First of Instruction No. 5, which posits the exercise of rights under the Workers' Compensation Law for which the employee was fired by the employer, is not supported by the evidence.

Proposition First describes two exercises of workers' compensation rights by the plaintiff, "receiving medical treatment and remaining off work until released by his doctor to return to work." There was evidence that Hopkins was injured on the job, taken to the hospital, remained there for several days, then sent home still under medical treatment, and then released for work by the physician on January 7, 1987. The medical treatment and the interim of disability from work are incidents of compensable benefits under the Workers Compensation Law. §§ 287.140 and 287.160. These are the rights that Hopkins was exercising or had already exercised at the time his employment was terminated by Ladd on January 20, 1987. Thus the evidential basis for proposition First was supplied.

Tip Top argues nevertheless that proposition First is "confusing and contradictory to the evidence actually developed at trial" because the only time Hopkins was released to return to work was on April 1, 1987. The return to work by Hopkins from January 7 to January 20—when he was fired—Tip Top argues, was without a doctor's release. There was evidence of two incidents of release to work by the treating

physician. The first, on January 7 pending the laboratory report, was the release for work that did not expose Hopkins to lead fumes. The second, on April 1, was the final unconditional release.

The argument by Tip Top denies to Hopkins the best intendments of the full evidence, and the right to submit according to the theory of those intendments. That evidence was that at the time he fired Hopkins, on January 20, Ladd knew that Hopkins had sustained a compensable work injury, was under treatment for the injury, and had been released to work by the physician with restrictions. That is to say, Ladd knew that Hopkins was exercising his rights under the Workers' Compensation Law. Ladd fired Hopkins. In explanation, Ladd told Hopkins that there had been too many workers' compensation claims already, that the premiums were too high, and that Tip Top could not afford "to take a chance" on any more such claims. The only exercise of rights by Hopkins at that time was the medical treatment and the absence from work during that period until the release to return on January 7. The jury could not have been misled by the evidence of another release, that of April 1, long after Hopkins was fired. It was presented to the jury and understood, not to prove a basis for the claim of discrimination, but as the jury verdict reflects, as the premise for their calculation of lost wages and damages.

■ Tip Top presents a final point. It contends that damages were excessive, not responsive to the evidence, and were otherwise unreasonable because Hopkins made no serious effort to mitigate his loss.

■ Section 287.780 creates an independent tort. *Reed v. Sale Memorial Hosp. & Clinic*, 698 S.W.2d 931, 940[19] (Mo.App.1985). The damages encompass loss of wages, but are not concluded by them. *See Wiedower v. ACF Indus.*, 763 S.W.2d 333, 334 (Mo.App.1988); *Henderson v. St. Louis Hous. Auth.*, 605 S.W.2d at 804[10]; *Arie v. Intertherm*, 648 S.W.2d at 156[23].

Hopkins was released by the physician for work without restriction on April 1, 1987. His rate of pay as a plumber was $16.92 per hour, or $676 per week, and $35,152 per year. He remained discriminatorily discharged by Tip Top from April 1, 1987, until May 15, 1989, and lost wages of $73,684. In that interim he found temporary work as a plumber with Rodriguez Mechanical at $16.92 per hour for 16 weeks [$10,816] and also worked as an insurance saleman during 1988 [$6,000] and 1989 [$5,000], for $21,816 in earnings. He claimed damages for the actual loss of $51,-868. The jury awarded $46,681. The judgment entered on the verdict was supported by substantial evidence and was not excessive. There was evidence, moreover, that Hopkins made sincere and insistent efforts to find work, first with union shops through the union as was customary for a member, and then personally with non-union shops when his membership lapsed for failure to pay dues. Thereafter there was evidence that he found and took the work that was available. There is no basis for the contention of failure to mitigate damages, even if that issue may be said to be properly before us at all.

The judgment is affirmed.

All concur.