Judy A. BOYLE, Respondent,

v.

VISTA EYEWEAR, INC. and David A. Baker, Appellants.

No. WD 34975.

Missouri Court of Appeals, Western District.

Nov. 5, 1985.

·Timothy W. Monsees (argued) and James C. Morrow,· Kansas City, for appellants.

J. Michael Murphy, Liberty, for respondent.

Before KENNEDY, P.J., and NUGENT and BERREY, JJ.

NUGENT, Judge.

Vista Eyewear, Inc., and David A. Baker, defendants, appeal from a judgment for plaintiff Judy A. Boyle following a jury verdict awarding Mrs. Boyle $1.00 in actual damages and $15,000 punitive damages for furnishing her a service letter which falsely stated the reasons her employment was

terminated. Mrs. Boyle cross-appeals from dismissal of the wrongful discharge count of her petition. We affirm the circuit court's judgment on Counts I and II and reverse its judgment on Count III and remand that count.

Plaintiff, Judy A. Boyle, worked as a lab helper for Vista Eyewear, an optical manufacturing company, from September, 1977, to January 9, 1979, in Vista's bench department. Her duties included hand-edging, hardening and testing eyeglass lenses produced by defendant. The regulations of the United States Food and Drug Administration require all eyeglass manufacturers to test all glass lenses for their resistance to breaking or shattering before such lenses may be sold or distributed to the public.

Plaintiff's evidence tended to establish that the standard industry procedure is to submit all lenses to either a hardening chemical treatment or heat treatment. The "chem-test" process involves an overnight bake of a tray of the glass lenses in a chemical solution. The heat treatment involved the heating of one lens at a time. After either such treatment, to determine whether lenses have sufficiently hardened, the lenses are subjected to an impact test. Each lens is placed in a drop ball machine and a steel ball the size of a quarter is dropped about forty-eight inches through a tube to strike the center of the lens.

Plaintiff and her witnesses testified that the drop ball impact test was never used by Vista and that on all rush jobs and on some other lens jobs the hardening treatment was skipped. Nevertheless, plaintiff was required to initial a form for each set of eyeglasses stating that she had heat or chemically treated and impact tested the lenses.

Mrs. Boyle complained to her supervisor and to defendant David Baker, president and part owner of Vista, about the company's practice of not hardening and testing lenses. When she spoke to Mr. Baker expressing concern about potential injuries to customers' eyes, he said that it was not her worry, that he had insurance that would take care of it if he got sued. Plaintiff told Mr. Baker that "money was a poor substitute for somebody's eyesight." She testified that Baker "was very aggravated with me. He told me ..., 'Just go do what you're told. I don't want to hear any more about it.' "

She warned her employer that she would report the violations of the law to governmental authorities, but defendant continued their practice. During her tenure with Vista, she repeatedly urged her employer to make certain that the lenses were hardened and tested in a manner consistent with what she believed to be the law.

After months of such fruitless urgings, Mrs. Boyle and four other employees complained to the Occupational Safety and Health Administration (OSHA) that the tests were not being conducted. When they learned that OSHA had no jurisdiction over such matters, they complained to the federal Food and Drug Administration (FDA). They told Mr. Baker what they had done and again he was aggravated. Then Mrs. Boyle told Mr. Baker that she *would* perform the required eyeglass lens hardening and testing.

Mr. Baker asked Mrs. Boyle and another employee, Bob Bond, to withdraw the complaints and to tell the FDA that they had lied. He also instructed other employees to throw broken glass into the bottom of the drop ball testing machine, apparently to give the FDA the false impression that drop ball testing was being done. A few weeks later, in November, 1978, OSHA conducted an investigation of defendants' premises.

About two months after the complaints to the FDA, on January 9, 1979, David Douglas, plaintiff's supervisor let plaintiff know that something was wrong. He told her that nothing was wrong with her production or work. He said that the problem was that she had reported to Mr. Baker, the president, that Douglas was using drugs. Mrs. Boyle asked Douglas to go

with her to Mr. Baker to prove that she had not so accused him. Douglas refused and fired her on the spot. On cross-examination plaintiff quoted Douglas as saying the problem was not with her work but, "I am mad because you have turned me in on drugs to Mr. Baker." He then yelled, "You are fired. Get out." When she protested that she had not told Mr. Baker that he was using drugs, Douglas said, "Yes, you did. You are fired."

Plaintiff went immediately to Mr. Baker's office to protest. She told him what had happened and of Douglas' accusation of her. Baker said nothing—he just looked at the floor—when she challenged him, asserting that he knew Douglas was not telling the truth. She asked Baker if the reason she was being fired was that she had gone to the federal agencies, but Baker, she testified, just stood there and said nothing.

Defendant Baker on direct examination testified that Mrs. Boyle came "roaring in" to his office on January 9 and said that Douglas had fired her for arguing with him. He had no choice but to "go along." On cross-examination, however, Baker conceded that plaintiff "was a good worker" who to his knowledge did her work satisfactorily. Baker admitted that plaintiff had told him that Douglas had fired her "because he says that I told you [Baker] that David Douglas was on drugs." Baker testified, nevertheless, that this was the first time the subject of drug abuse had been mentioned to him. Despite that, he declined to call Douglas in about the false accusation on the basis of which he had just fired plaintiff. He testified that he just "had to let her go," that as management he had to stand behind his supervisor.

Plaintiff testified that the next day she reported to the Division of Employment Security that she was fired for accusing her supervisor of doing drugs, but that she had always believed that the true reason was that she had made the complaints about defendants' failure to harden and test the lenses.

On January 20, 1979, Bob Bond, a coworker who had filed the complaints with plaintiff, was fired for "absenteeism." In due time, Mrs. Boyle made a written request to David Baker and Vista for a service letter stating the true reason for her discharge. In his answer, Mr. Baker wrote that the reason for her discharge was her arguing with her departmental supervisor.

Thereafter, Mrs. Boyle filed her petition for unpaid overtime compensation (Count I) and for damages for failure to issue a service letter that correctly stated the true reason for her discharge (Count II). She alleged that she was fired for the complaints made to OSHA and the FDA and not, as defendants stated in their service letter, for arguing with her supervisor. Later she added Count III alleging that she was wrongfully discharged from her employment for filing complaints with OSHA and FDA.

Defendants filed a motion to dismiss Count III on the ground that she was an at-will employee and that Missouri law does not recognize a cause of action for wrongful discharge of such an employee absent a contract of employment or statutory authority. Defendants further alleged that the Missouri courts were without subject matter jurisdiction to try causes asserting violations of OSHA and FDA. The trial court granted defendants' motion and dismissed Count III for failure to state a claim.

Counts I and II were tried to a jury. It found in favor of plaintiff's overtime claim and awarded her $1,500. The jury also found that the failure to pay overtime wages was willful and not in good faith and awarded plaintiff additional liquidated damages in the amount of $1,500 and $750 for reasonable attorneys' fees. The jury found in favor of Mrs. Boyle on her service letter claim and awarded her $1.00 in actual damages and $15,000 in punitive damages.

Both parties appealed.

On appeal, defendants Vista and Baker present three points: First, that in submit-

ting the issue of punitive damages to the jury the trial court erred because the amendment to § 290.140 enacted August 13, 1982, is retroactive in application and bars plaintiff's recovery of punitive damages. Second, that in denying their motions for judgment notwithstanding the verdict or, in the alternative, for a new trial, the court erred in that plaintiff failed to present substantial evidence that the service letter falsely stated the reason for her discharge. Finally, that in denying Vista's motion for a mistrial the trial court erred because plaintiff's evidence went beyond the scope of the limitations requested by Vista in its motion in limine.

On her cross-appeal, Mrs. Boyle asserts that the trial court erred in dismissing Count III of her petition for failure to state a cause of action.

Inasmuch as Vista challenges the submissibility of the case on Count II of the petition, we consider the evidence in the light most favorable to the plaintiff and accept such evidence as true, giving the plaintiff the benefit of all favorable inferences reasonably to be drawn from the evidence and disregarding the defendant's evidence except insofar as it aids the plaintiff's case. *Wells v. Orthwein,* 670 S.W.2d 529, 532 (Mo.App.1984).

### I. *Punitive Damages*

■ Defendant's first point is that the trial court erred in submitting the issue of punitive damages to the jury in that the amendment to Missouri's service letter statute, § 290.140,[1] is retroactive in its application. We are asked to decide whether § 290.140, which became effective on Au-

gust 13, 1982, operates retroactively to bar recovery of punitive damages at trial on February 14, 1983, of an action filed January 15, 1980, on a March 12, 1979, service letter.

Defendants argue that, even though Article I, § 13, of the Constitution of Missouri, 1945,[2] prohibits the enactment of any ex post facto laws, § 290.140 must be given retroactive effect. Defendants point to four recognized exceptions to the prohibition against retrospective operation of a statute: (1) where the legislature manifests a clear intent that the statute be retroactive; (2) where the statute is procedural only and does not affect any substantive rights of the parties; (3) where the statute does not take away or impair vested rights acquired under existing laws; and (4) where the statute results in a reduction in a penalty or punishment. Defendants believe that their case falls within all of these exceptions.

### A.

As to the first exception, defendants argue that the legislature has shown a clear intention that the statute is to operate retrospectively. Their argument has three points: (1) the legislature did not expressly say that the law is to be applied prospectively; (2) the language of the statute suggests that the statute is not limited to prospective application; and (3) the amendment removing punitive damages reveals disapproval of the punitive damages provision of § 290.140 and implies legislative intent that the law be retroactive.

Those arguments do not establish a clear, specific intention of the legislature to

---

**1.** All sectional references are to Revised Statutes of Missouri, 1978, as amended.

Before its amendment in 1982, courts had judicially interpreted the service letter statute to include punitive damages. *State ex rel. Deering v. Corcoran,* 652 S.W.2d 228 n. 1, (Mo.App. 1983). That amendment includes subsection 2 pertaining to damages which reads as follows:

"Any corporation which violates the provisions of subsection 1 of this section shall be liable for compensatory but not punitive damages but in the event that the evidence establish-

es that the employer did not issue the requested letter, said employer may be liable for nominal and punitive damages; but no award of punitive damages under this section shall be based upon the content of any such letter."

**2.** Article I, § 13, provides: "That no ex post facto law, nor law impairing the obligations of contracts, or retrospective in its operation ... can be enacted."

apply the statute retroactively. A general presumption prevails against retroactive effect of statutes. *Protection Mutual Insurance Co. v. Kansas City,* 551 S.W.2d 909, 912 (Mo.App.1977). In *State ex rel. Deering v. Corcoran,* 652 S.W.2d 228 (Mo. App.1983), a case that is factually similar to this case, the court said at 229:

> This amendment is not by its terms retroactive. If the legislature had intended its retroactive application, it would have so provided. This court will not imply such a provision. Moreover, when the legislature repeals an existing statute, it is considered to have done so in contemplation of the general savings statutes, §§ 1.170 and 1.180 RSMo 1978. Unless the legislature specifically provides that the repeal be retroactive, it is presumed that these savings provisions are to be incorporated by reference with the same effect as if the repealing statute contained its own savings clause. (Footnote and case citations omitted.)

*See also, Arie v. Intertherm, Inc.,* 648 S.W.2d 142, 159 (Mo.App.1983); *Protection Mutual Insurance Co. v. Kansas City, supra,* 551 S.W.2d at 912. This court has recently followed *State ex rel. Deering v. Corcoran* in *Vaughan v. Taft Broadcasting Co.,* No. WD 35,724 (Mo.App. May 28, 1985). (Defendants assert that the statutory savings clauses, §§ 1.170 and 1.180,[3] do not apply in this case because plaintiff has no vested right to punitive damages, an argument we address later.)

**B.**

Citing the second exception, defendants contend that the amendment to § 290.140 is procedural and does not affect any of plaintiff's substantive rights. They say that if a statute is procedural or remedial it may operate retroactively. They cite *State ex rel. St. Louis-San Francisco Railway Co. v. Buder,* 515 S.W.2d 409 (Mo.1974) (en banc), dealing with an amendment to § 537.090, which removed the $50,000 recovery limitation in wrongful death actions. There the issue was whether an amendment changing the recoverable amount was procedural, not substantive. The court held that the statute affected substantive, not procedural, rights of the parties and was not retroactive. In principle, *Buder* is indistinguishable, and we follow it. The amendment to § 290.140 affects a substantive right of the plaintiff and is not retroactive under the second exception.

**C.**

Referring to the third exception, defendants assert that § 290.140 is retroactive because the expectancy of punitive damages does not become a vested right until judgment. They cite numerous foreign cases for the principle that plaintiff acquires a vested right only when judgment has been entered. We deal only with the Missouri cases.[4]

In *Arie v. Intertherm, Inc.,* 648 S.W.2d 142 (Mo.App.1983), a case involving a ques-

---

**3.** § 1.170 Repeal of Law not to affect rights acquired thereunder.

The repeal of any statutory provision does not affect any act done or right accrued or established in any proceeding, suit or prosecution had or commenced in any civil case previous to the time when the repeal takes effect; but every such act, right and proceeding remains as valid and effectual as if the provisions so repealed had remained in force.

§ 1.180 Actions Pending, How affected by Repeal of Law.

No action or plea, pending at the time any statutory provisions are repealed shall be affected by the repeal; but the same shall proceed, in all respects, as if the statutory provisions had not been repealed, except that all proceedings had after the repeal becomes effective are governed by procedural rules and laws then in effect, insofar as they are applicable.

**4.** Defendants also cite as authority, *Peters v. Connecticut General Life Insurance Co.,* No. 82–975 (D.C.Mo.) December 13, 1982. This is an unpublished opinion from a U.S. District Court for the Eastern District of Missouri. Missouri courts are not bound to follow a decision of that court when it undertakes to interpret Missouri law. Further, at the time *Peters* was decided, the law on this issue was undeveloped in Missouri. Since that decision, Missouri courts dealing with the same issue have chosen not to

tion of the retroactive effect of § 290.140, the Eastern District of this court was asked to determine whether a right to punitive damages vested *after* a judgment had been entered. The court said at 159:

> Neither party to this appeal has cited us any Missouri cases deciding this question, and our research has failed to bring forth any. Our research has, however, surfaced three cases where legislation precluding punitive damages in a situation akin to that we have before us where the courts held that prior to entry of judgment no plaintiff has a vested right to punitive damages and a statute precluding an award of punitive damages may constitutionally be applied retroactively; however, once the plaintiff has had a judgment awarding him punitive damages he has a "vested right" in said punitive damages and cannot be deprived of the punitive damages by retroactive application of a statute precluding an award of punitive damages which was enacted and took effect after the entry of judgment.

Shortly thereafter, the same court was again presented with this retroactivity issue in *State ex rel. Deering v. Corcoran, supra,* 652 S.W.2d at 230. There the court faced the exact issue we face, that is, whether the plaintiff had a right to punitive damages at the time he filed his cause of action. The court rejected the argument that *Arie* held that a plaintiff had no right to punitive damages when the action began and that until plaintiff obtained a judgment

his cause of action for such damages was a mere expectation. The *Deering* court held that the plaintiff's right to punitive damages "was valid under the law at the time the petition was filed." The court further held that to deprive a plaintiff of a cause of action provided by law at the time the action began simply because the case had not yet proceeded to trial and final judgment was not in accord with public policy.[5] Of course, in *Deering* and in the instant case, at the time of filing an integral part of each plaintiff's cause of action was the right to sue for punitive damages.

The issue before us now is that addressed in *Deering,* and not that addressed in *Arie* and *Musselman.* That issue is whether a vesting of plaintiff's right to punitive damages may occur earlier than the time of entry of a judgment. *Deering* says, "Yes," and we agree. In *Arie* the court's language is broader than it had to be to decide the question before it. The only question the *Arie* court had to decide was whether the entry of the judgment *before* the amendment of the statute was effective to vest the right of the plaintiff to punitive damages. The court was not asked to decide whether the right was vested before judgment because the judgment had already been entered when the statute was amended. Therefore, anything the court said about that unasked question is obiter dictum, not a part of the holding and not of precedential value.[6] On the other hand, *Deering* holds that the cause of action was valid at the time the petition was

---

follow the approach adopted by the court in *Peters.*

**5.** The Eastern District apparently once again faced this issue in *Musselman v. Anheuser-Busch, Inc.,* 657 S.W.2d 282, 285 (Mo.App.1983). As in *Arie,* plaintiff apparently already had his judgment for nominal and punitive damages before the effective date of the amendment of § 290.140. (Unfortunately, the date of the judgment is not given in the opinion.) *Musselman* follows the rule set out in *Arie* that a plaintiff acquires a vested right once a judgment has been entered.

**6.** "There is no doctrine better settled than that the language of judicial decisions must be construed with reference to the facts and issues of the particular case, and that the authority of the decision as a precedent is limited to those points of law which are raised by the record, considered by the court, and necessary to a decision." *Parker v. Bruner,* 683 S.W.2d 265 (Mo. 1985) (per curiam; en banc), quoting from *State ex rel. Baker v. Goodman,* 364 Mo. 1202, 274 S.W.2d 293, 297 (1954) (en banc); *see also Coalition to Preserve Education on the Westside v. School District of Kansas City,* 649 S.W.2d 533, 536 (Mo.App.1983).

filed and, therefore, that plaintiff at that time had a vested right in his cause of action for punitive damages. The *Arie* and *Deering* cases cannot be in conflict, as defendants assert, because they do not address the same issue.

We hold that when plaintiff filed her action she had a vested right to punitive damages.

As we noted earlier, defendants also contend that §§ 1.170 and 1.180 do not apply here because plaintiff had no vested right. What we have just said refutes that argument, but even if we held that plaintiff had no vested rights to punitive damages, the savings clauses still would apply. The narrow construction that defendants would give these statutes is inconsistent with our holding in *Protection Mutual Insurance Co. v. Kansas City, supra,* 551 S.W.2d at 912, which is that the wording of § 1.170 and § 1.180 does not confine the operation of those sections to the preservation of "vested rights."

#### D.

■ As to the fourth exception, defendants argue that § 1.170 and § 1.180 do not apply because § 290.140 is penal and the amendment should be given retroactive effect under § 1.160 since, as amended, § 290.140 altered the law creating the offense and reduced the penalty or punishment that was previously cognizable under that section.

Until its amendment, § 290.140 provided that failure or refusal to issue a service letter was a misdemeanor punishable by fine or imprisonment. It was judicially interpreted to authorize a civil cause of action for actual and punitive damages. As the court stated in *Deering, supra,* 652 S.W.2d at 229,

> We further believe that these savings statutes [§§ 1.170 and 1.180] are on point because the subject matter in dispute is the assessment of punitive damages. Punitive damages are not compensatory

in nature but instead are private fines levied by civil juries to punish reprehensible conduct and to deter the wrongdoer from engaging in the same type of activity. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974); *Probst v. Probst,* 595 S.W.2d 289, 292 (Mo.App.1979). Therefore, while we concede the origin of the subject cause of action was a penal criminal statute, the judicial interpretation conferring a civil cause of action for actual and punitive damages persuades us to apply the stated public policy of both §§ 1.170 and 1.180.

We agree, and hold that § 290.140 is not penal, thus §§ 1.170 and 1.180 are applicable.

### II. *Sufficiency of Service Letter Evidence*

#### A.

■ Defendants' second point on appeal is that the trial court erred in denying their motions for judgment notwithstanding the verdict or, in the alternative, for a new trial on Count II. They say that plaintiff failed to present substantial evidence that the service letter was false. The service letter stated that Mrs. Boyle was terminated for "arguing with her supervisor." Viewing the evidence most favorable to Mrs. Boyle, we hold that she adduced substantial evidence from which the jury could reasonably find that defendants did not discharge Mrs. Boyle for "arguing with her supervisor" but in retaliation for her resistance to the defendants' illegal practices and directives and for filing complaints with OSHA and the FDA.

A finding essential to recovery maybe proved by circumstantial evidence. But those circumstances must be such that the facts necessary to support the finding may be inferred and reasonably must follow; their existence may not depend upon guess work, conjecture or speculation; and the evidence must tend to exclude every reasonable conclusion other than the one de-

sired. *Stark v. American Bakeries Co.*, 647 S.W.2d 119, 125 (Mo.1983) (en banc); *Herberholt v. dePaul Community Health Center*, 625 S.W.2d 617, 623 (Mo.1981) (en banc).

To establish that the service letter did not truly state the reason for her discharge, plaintiff must show by substantial evidence that she was not discharged for arguing with her supervisor. Plaintiff's evidence is consistent with the inference that the reason for her discharge was that she filed complaints with OSHA and the FDA. She adduced evidence to prove that she was an experienced and qualified employee, that she worked long hours, and that her work was completely satisfactory to the defendants. She was characterized as a good worker by her supervisor and by Vista's president, defendant David Baker. The evidence was that she persistently complained to the defendants about defendants' policies regarding the testing and hardening of lenses, that she declined to omit the hardening and testing, that she refused to sign the forms falsely attesting to hardening and impact testing, that she and four other employees filed complaints with OSHA and the FDA, and that she was fired not long after that.

Defendants assert that plaintiff's evidence taken as a whole is insufficient to make a submissible case, that she did not present any evidence that Vista intentionally, maliciously, wilfully, and wantonly failed to state the true reason for plaintiff's discharge. The burden of proof in a service letter claim is set out in *Potter v. Milbank Manufacturing Co.*, 489 S.W.2d 197, 203 (Mo.1972): "Plaintiff has no burden of proving the true reason for his discharge; his burden is negative in character because the true reason is peculiarly within the knowledge of the employer, and burden of showing the truth of the asserted reason for discharge is on the employer." *See also Newman v. Greater Kansas City Baptist and Community Hospital Association,* 604 S.W.2d 619 (Mo.App.

1980). Defendants argue that substantial probative evidence must show that the reason stated in the service letter for plaintiff's discharge is false. *Williams v. Kansas City Transit, Inc.,* 339 S.W.2d 792, 799 (Mo.1960). Plaintiff met that burden.

The testimony tends to show that for a number of months plaintiff Boyle was the leader of a group of Vista employees who were concerned about Vista's failure to abide by industry practices and federal regulations designed to protect the wearers of eye glasses. Plaintiff was the employee who was personally troubled by her employer's requirement that she initial the cards falsely attesting to the performance of the hardening treatments and the impact tests. She warned the defendants that she would report the violations of law and repeatedly urged them to abide by the law. She was the employee who insisted upon performing those functions despite Mr. Baker's admonition to do as she was told, that he did not want to hear any more complaints from her about the firm's dangerous practices and violations of the law.

One fact in particular established by the plaintiff's evidence and confirmed by defendant Baker's own testimony is most compelling. Mr. Baker testified that no one, including Mrs. Boyle, had ever told him that David Douglas was using drugs. Nevertheless, when he heard, as he testified he did, that Douglas had falsely charged Mrs. Boyle with reporting Douglas' alleged drug abuse, despite plaintiff's request that he tell Douglas the truth, defendant Baker did nothing. From his refusal to confront Douglas with the truth and to protect plaintiff from an unjust charge, the jury could reasonably have concluded either that Mr. Baker and Mr. Douglas had colluded in concocting an excuse to fire plaintiff or that Mr. Baker took advantage of an apparently legitimate excuse to rid the firm of a gadfly. In either event, the jury could reasonably have found that, under all the evidence, the reason stated for plaintiff's discharge in defendants' service letter was false.

The day after she was fired, plaintiff filed a claim for unemployment benefits in which she told that agency that she had been fired for accusing her supervisor of using drugs. Defendants contend that this admission and other such contemporaneous admissions to co-workers preclude plaintiff's recovery. Defendants fail to note, however, that Mrs. Boyle testified in her pretrial deposition and at trial that she had always believed that the true reason for her discharge was the complaints she had so insistently voiced about defendants' practices. The jury was, of course, free to believe all or part of the testimony, rejecting such evidence as it saw fit. *See Bubke v. Allied Building Credits, Inc.*, 380 S.W.2d 516, 522 (Mo.App.1964). As we have already observed, upon this review we consider the evidence in the light most favorable to the plaintiff, accepting it as true and giving her the benefit of all favorable inferences reasonably to be drawn from it, *Wells v. Orthwein, supra,* 670 S.W.2d at 532, just as the jury was entitled to do.

In any event, Mrs. Boyle's opinion as to why she was fired was only an opinion, and her opinion may have changed as she reflected on what had happened. The jury could reasonably have concluded that only slowly did it dawn on plaintiff that the heated exchange with her supervisor was only Vista's sham excuse for firing a disruptive employee who insisted upon obeying the law and not endangering eyeglass wearers.

But even if we accept plaintiff's statements (that defendant Vista fired her for accusing Douglas of drug abuse) as statements of fact, the rule is that conflicting statements of a witness may be reasonably explained or other facts and circumstances may tend to show the truth, creating a question for the jury. *Adelsberger v. Sheehy,* 332 Mo. 954, 59 S.W.2d 644, 647 (1933). Moreover, "prior statements of a witness, even though the witness is a party, while admissible for impeachment, do not destroy the prima facie probative effect of the contrary testimony of the witness at the subsequent trial." *Miller v. Multiplex Faucet Co.,* 315 S.W.2d 224, 227 (Mo.1958); *see also Welch v. Hyatt,* 578 S.W.2d 905, 913 (Mo.1979) (en banc); and *Bonastia v. Terminal Railroad Association,* 409 S.W.2d 122, 126 (Mo.1966).

## B.

■ Defendants' next contention is that the trial court erred in denying their motion for a mistrial on the grounds that the evidence presented at trial by plaintiff went beyond the scope of the limitations requested by defendants in their motion in limine, injected false issues into the lawsuit and relied upon irrelevant, immaterial, prejudicial, and inflammatory evidence.

Defendants' motion in limine requested that the court exclude

all statement, argument, testimony and evidence of any kind pertaining or relating to any violations or alleged violations of any state or federal safety and health statutes, regulations, guidelines or orders; specifically, but not limited to, any alleged violations of the Occupational Health and Safety Act of 1970 or the Federal Food, Drug and Cosmetic Act.

The record contains no specific ruling on the defendants' motion, but their motion for judgment notwithstanding the verdict states that the court denied the motion in limine. Before trial, counsel had met with the judge in his chambers, and, although the record does not show the exact limits, the judge did limit the testimony. But when plaintiff's attorney questioned a witness about Vista's and other companies' practices in manufacturing optical lenses, defendants' attorney objected:

Mr. Monsees: Your Honor, I see a line of questioning developing here I'd object to. I believe in chambers my understanding was that he could testify that he made complaints, and maybe he can testify that he accompanied her with the complaint, and the basic reasons

for making the complaint; anything over his experience in all these years, that we did this and that, I'm going to have to object as being irrelevant and immaterial to the service letter portion of this case.

The Court: The objection is overruled. I'm permitting this type of testimony to establish what had been their experience in the industry as to the testing, and so forth, and that this was not happening at the defendant's place of business, and they made the complaint. As to whether or not that is required by any law or regulation, that is not going to be permitted as evidence in this case.

The defendants acknowledge that the court did not permit any evidence of violations of law or regulations. On the two occasions when it appeared that plaintiff was about to present such evidence, the court sustained defendants' objections and instructed the jury to disregard the testimony.

The court properly denied the motion in limine. The testimony was relevant. "Evidence is relevant if it tends to prove or disprove a fact in issue, or to corroborate evidence which is relevant and which bears on the principal issue." *Arie v. Intertherm, Inc., supra,* 648 S.W.2d at 154. Plaintiff's burden was to establish that the reason for her discharge set out in the service letter was false. To meet that burden the trial court could properly permit her to present evidence of the true reason for her discharge.

The nub of defendants' point is that the nature of plaintiff's complaints to the federal agencies and the facts supporting them served no useful purpose in the trial of the case. Not only was defendants' practice in treating and testing lenses irrelevant and immaterial, they argue, but since the jury was unaware of what tests were required, a suggestion that defendants failed to treat and test lenses according to plaintiff's view of the proper practice di-

verted the jury's attention from the true issue and served to prejudice and inflame the jury against the defendants.

The answer to defendants' argument is that the nature of Mrs. Boyle's complaint to the FDA was relevant for these reasons: It was evidence showing the true nature and source of the conflict that led to her discharge because defendant Baker himself admitted the falsity of David Douglas' accusation of plaintiff and thereby established the absence of that ground for his abrupt firing of plaintiff. This evidence bore directly on the issue of the truth or falsity of the service letter.

In addition, the evidence of the nature of plaintiff's complaint to the FDA established at least four possible motives for defendants wanting to be rid of plaintiff: (1) retaliation for her disruptive conduct; (2) to preclude further complaints by plaintiff; (3) to discourage such conduct in other employees; and (4) to permit Vista to continue its practices. The relevancy of the evidence is self-evident: based on it, the jury could reasonably conclude that the defendants' motive for firing plaintiff was not her mere arguing with her supervisor.

For the same reason, defendants' contention that the court should have granted a mistrial has no merit. Moreover, their motion was not timely. They did not ask for a mistrial until the end of the second day of the trial. Before that they permitted the testimony to come in without requesting a mistrial.

Defendants finally complain that evidence of their practices was so inflammatory as to require suppression regardless of its relevance because it was obstructive and confusing, hindering the truth-finding process. Of course, without that evidence, plaintiff would have been improperly denied the chance to prove the justification for her FDA complaint and, more importantly, the reason for the defendants' omission from the service letter of the true reason for her discharge.

Assuming that, in fact, the defendants' practice of not treating and testing lenses

was supported by the evidence, as it was, and assuming further that the defendants had been willing to give plaintiff a truthful service letter, that letter would have read as follows: "Mrs. Boyle was discharged for refusing to disregard the FDA mandate to harden and impact-test eyeglass lenses, for declining falsely to attest to such hardening and testing, and for reporting to the FDA Vista's practice of neither hardening nor impact-testing glass lenses and requiring her, nevertheless, to attest to such treatment and testing."

### III. *Public Policy Exception to At-Will Employment Doctrine*

On her cross-appeal, plaintiff Boyle claims that the trial court erred in dismissing her Count III for failure to state a cause of action. She asserts that Count III states a claim for wrongful discharge of an at-will employee in violation of public policy as expressed in the federal statute and regulation governing manufacture of eyeglasses.

Count III, sounding in tort, alleges in its pertinent part that the defendants violated certain public policies by (a) manufacturing unsafe eyeglasses the lenses of which had not been hardened and tested in compliance with the regulations of the Food and Drug Administration; (b) taking reprisals against an employee for reporting violations of law to the authorities; (c) failing to protect citizens against dangerous, non-shatterproof eyeglasses; and (d) falsely attesting to prescribing physicians that lenses had been hardened and tested. It further alleges that the defendants fired plaintiff because she warned them that she would notify the authorities of their practices if they did not stop them and because

the defendants chose to continue their practice of falsely attesting to the hardening and testing of lenses. Count III finally alleges lost wages and mental anguish and seeks actual and punitive damages.

### A. *Dake v. Tuell*

Count III is based upon an exception to the employment-at-will doctrine, a rule most recently re-enunciated in *Dake v. Tuell*, 687 S.W.2d 191 (Mo.1985) (en banc), filed April 2, a decision we have been anticipating in the belief that the Supreme Court might furnish us additional guidance on the most recent developments in the law pertaining to discharge of at-will employees.

Although in recent years the courts in twenty-eight states have to one degree or another recognized a new public policy exception to the at-will employment doctrine, the plaintiffs in *Dake* chose not to invoke that exception but proceeded on the theory of prima facie tort.

*Dake*, as the Supreme Court noted, in its opening paragraph, involved the "sole issue ... whether discharged at will employees can maintain a suit for wrongful discharge against their former employers by cloaking their claims in the misty shroud of prima facie tort." Predictably, the court said, "No," as have other courts to which this particular prima facie tort question has been presented. *See, e.g., Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 448 N.E.2d 86, 90–91, 461 N.Y. S.2d 232, 236–37 (N.Y.1983). In *Dake* the court held that the prima facie tort theory is not available for use in circumventing the well-established employment-at-will doctrine. That doctrine simply provides that an employer can discharge for cause or without cause[7] an at-will employee who

---

7. The court carefully refrained from using the common expression that the employer may fire an at-will employee "for any reason." Professor Joan Krauskopf has observed that the language "for any reason" is not a part of the *holdings* in controlling Missouri at-will employment cases. She has written,

> Plaintifs [sic], in a large group of cases in which recovery for wrongful discharge was

denied, including the important decisions which first formulated the at will rule in Missouri, attempted only to establish a definite term or lifetime contract. They lost because those contracts were construed to be at will and subject to termination *at any time.* The opinions favoring employers because of plaintiff's failure to establish a term contract did not even discuss the *basis* for discharge.

does not otherwise fall within the protective reach of a contrary statutory provision. *Dake,* 687 S.W.2d at 193.

The Supreme Court, therefore, chose not to answer the unasked question whether in that case the public policy exception was available to those two Missouri at-will employees. In its tautly written opinion the court deliberately confined its decision to the prima facie tort question presented.

### B. "Public Policy"

■ The public policy exception is a narrow exception to the at-will employment doctrine. It provides that an at-will employee who has been discharged by an employer in violation of a clear mandate of public policy has a cause of action against the employer for wrongful discharge.

■ "Public policy" is that principle of law which holds that no one can lawfully do that which tends to be injurious to the public or against the public good. *Brawner v. Brawner,* 327 S.W.2d 808, 812 (Mo. 1959) (en banc); *Dille v. St. Luke's Hospital,* 355 Mo. 436, 196 S.W.2d 615, 620 (1946). It finds its sources in the state constitution, *In re Rahn's Estate,* 316 Mo. 492, 291 S.W. 120, 123 (Mo.1927), *cert. de-*

nied, 274 U.S. 745, 47 S.Ct. 591, 71 L.Ed. 1325 (1927); in the letter and purpose of a constitutional, statutory or regulatory provision or scheme, *Parnar v. Americana Hotels, Inc.,* 65 Haw. 370, 652 P.2d 625 (1982); *Nye v. Department of Livestock,* 196 Mont. 222, 639 P.2d 498, 502 (1982); *Adler v. American Standard Corporation,* 291 Md. 31, 432 A.2d 464, 472 (1981); in the judicial decisions of the state and national courts, *Brawner v. Brawner,* at 812; *In re Rahn's Estate,* 291 S.W. at 123; *Lucas v. Brown & Root, Inc.,* 736 F.2d 1202, 1205 (8th Cir.1984); in "the constant practice of the government officials," *United States v. Trans-Missouri Freight Association,* 166 U.S. 290, 340, 17 S.Ct. 540, 558, 41 L.Ed. 1007 (1897), (quoted with approval in *In re Rahn's Estate* 291 S.W. at 123); and, in certain instances, in professional codes of ethics, *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A.2d 505, 512 (1980). The at-will employment doctrine itself is judicially enunciated public policy.

In this case the public policy alleged to have been violated is set out in the federal Food and Drug Administration's regulation found in 21 C.F.R. § 801.410.[8] In summary, that regulation first notes that the data

---

They held only that the contract could be terminated at any time by either party without cause. Since nothing was said about being able to terminate "for any reason" at all, expansion of the wrongful discharge tort would not overrule these precedents. (Footnotes omitted.)

J. Krauskopf, *Employment Discharge: Survey and Critique of the Modern At Will Rule,* 51 U.M.K.C.L.Rev. 189 (1983) at 261.

The court in *Smith v. Arthur C. Baue Funeral Home,* 370 S.W.2d 249 (Mo.1963), in dictum used the "for any reason" phrase in describing the scope of the application of the at-will doctrine. Nevertheless, the court held that an employee fired because he had asserted his constitutional right to choose collective bargaining representatives could bring an action for damages against his employer for wrongful discharge. *Id.* at 254.

**8.** Adopted and promulgated pursuant to 21 U.S.C. § 360j(f)(1)(A), which in its pertinent parts provides as follows:

"§ 360j. General provisions respecting control of devices intended for human use
. . . .
(f) Good manufacturing practice requirements
(1)(A) The Secretary may, in accordance with subparagraph (B), prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture, packing, storage, and installation of a device conform to current good manufacturing practice, as prescribed in such regulations, to assure that the device will be safe and effective and otherwise in compliance with this chapter."
Section 351 of Title 21, U.S.Code, provides in part as follows:
"§ 351. Adulterated drugs and devices
A drug or device shall be deemed to be adulterated—
. . . .
(h) Manufacture, packing, storage, or installation of device not in conformity with applicable requirements or conditions
If it is a device and the methods used in, or the facilities or controls used for, its manufacture, packing, storage, or installation are not

"available on the frequency of eye injuries resulting from the shattering of ordinary crown glass lenses constitutes an avoidable hazard to the eye of the wearer." It recites that the consensus of the ophthalmic community is that use of impact-resistant lenses in eyeglasses and sunglasses would substantially reduce the number of eye injuries. The regulation then mandates that such glasses be fitted by their manufacturers with impact-resistant lenses unless the prescribing doctor finds that they will not meet the visual needs of the individual patient. The physician or optometrist has the option of ordering glass, plastic or laminated lenses made impact-resistant by any method, but all such "lenses shall be capable of withstanding the impact test" described in paragraph (d)(2) of § 841.410.

The regulation then requires that each finished impact-resistant glass lens for prescription use, with certain specified exceptions, be individually tested and shown to be capable of withstanding the impact test described in paragraph (d)(2). Those persons conducting the tests "shall maintain the results thereof and a description of the test method and of the test apparatus for a period of 3 years."

The prescribed test, called the "referee test," consists of the dropping of a .56 ounce ⅝-inch steel ball from a height of fifty inches onto the horizontal upper surface of each individual lens, striking within a ⅝-inch diameter circle located at the geometric center of the lens. Paragraph (d)(2) suggests the use of a tube through which to drop the steel ball. To pass the test, the lens must not fracture.

## C. The Public Policy Exception Cases

The most recent converts to the public policy exception to the at-will employment doctrine are the Supreme Court of Texas in *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733 (Tex.1985), and the North Carolina Court of Appeals in *Sides v. Duke Hospital,* 74 N.C.App. 331, 328 S.E.2d 818 (1985).

In *Hauck,* the plaintiff, a deckhand for Sabine, alleged that he was told that one of his daily duties was to pump the bilges of the vessel on which he worked. He observed a placard posted on the vessel that warned that pumping the bilges into the water was illegal under federal law, and his call to the Coast Guard confirmed that warning. Accordingly, he refused to pump the bilges into the water and was fired for his refusal. The trial court rendered summary judgment for Sabine. The court of appeals reversed. The Supreme Court held, at 735,

in conformity with applicable requirements under section 360j(f)(1) of this title. . . ."

Additional relevant provisions are § 331, § 333 and § 321, which provide in their respective relevant parts as follows:

"§ 331. Prohibited acts

The following acts and the causing thereof are prohibited:

(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded."

"§ 333. Penalties—Violation of section 331 of this title

(a) Any person who violates a provision of section 331 of this title shall be imprisoned for not more than one year or fined not more than $1,000, or both.

Second offenses; intent to defraud or mislead

(b) Notwithstanding the provisions of subsection (a) of this section, if any person commits such a violation after a conviction of him under this section has become final, or commits such a violation with the intent to defraud or mislead, such person shall be imprisoned for not more than three years or fined not more than $10,000, or both."

"§ 321. Definitions; generally

For purposes of this chapter—

(h) The term 'device' . . . means an instrument, apparatus, implement, machine, contrivance, . . . or other similar or related article, including any component, part, or accessory, which is—

. . . .

(2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animal, or

(3) intended to affect the structure or any function of the body of man or other animals, and which does not achieve any of its principal intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of any of its principal intended purposes."

that public policy, as expressed in the laws of this state and the United States which carry criminal penalties, requires a very narrow exception to the employment-at-will doctrine.... That narrow exception covers only the discharge of an employee for the sole reason that the employee refused to perform an illegal act.

The *Hauck* decision is representative of only one kind of case under the public policy exception. Those cases deal with employees fired because they declined to obey directions to commit a crime or to act contrary to public policy. The seminal case is *Petermann v. International Brotherhood of Teamsters*, 174 Cal.App.2d 184, 344 P.2d 25 (1959), in which plaintiff, a business agent for a union local refused his supervisor's directive to commit perjury before a legislative committee and was, therefore, fired. The court held that he had a cause of action. Likewise, in *Magnan v. Anaconda Industries, Inc.*, 193 Conn. 558, 479 A.2d 781, 791 (1984), an at-will employee was held to have a cause of action for retaliatory discharge where he alleged that he had been discharged for refusing to sign a false statement that the defendant knew to be untrue.

Other cases in this category include the recently decided case of *Sides v. Duke Hospital, supra,* 328 S.E.2d 818, 826–27 (no employer has the right, notwithstanding the at-will employment doctrine, to fire an employee and deprive him of his livelihood without civil liability because he refuses to testify untruthfully or incompletely in a court case); *Delaney v. Taco Time International, Inc.*, 297 Or. 10, 681 P.2d 114, 118 (1984) (employer is liable for wrongfully discharging employee because he refused to sign the potentially defamatory statement in violation of his societal obligation imposed by Oregon law); *Lucas v. Brown*, 736 F.2d 1202, 1205 (8th Cir.1984) (construing Arkansas law to hold that a woman fired for refusal to prostitute herself by sleeping with her foreman should

not be penalized for refusing to do what the law forbids); *Kalman v. The Grand Union Co.*, 183 N.J.Super. 153, 443 A.2d 728, 730 (1982) (a pharmacist fired for refusal to disobey a state board of pharmacy regulation, thereby jeopardizing his own license, was held discharged in violation of a clear mandate of public policy); *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 164 Cal.Rptr. 839, 844, 610 P.2d 1330, 1335 (1980) (employee discharged for refusing to engage in price cutting in violation of antitrust law and a consent decree, "grossly illegal and unlawful acts"); *Trombetta v. Detroit, Toledo & Ironton Railroad Co.*, 81 Mich.App. 489, 265 N.W.2d 385, 388 (1978) (where employee refused to manipulate and adjust sampling results used in pollution control reports filed under state law, a clear violation of law, and was for that reason fired, he has a cause of action); *O'Sullivan v. Mallon*, 160 N.J.Super. 416, 390 A.2d 149, 150 (1978) (petition alleging that defendants fired plaintiff for refusing to perform catheterizations in violation of state law that authorized only licensed doctors and nurses to perform that procedure states a cause of action; this "rule is especially cogent where the subject matter is the administration of medical treatment, an area in which the public has a foremost interest....").

Another category of public policy exception cases involves employees who report wrongdoing or violations of law or public policy by their employers or fellow employees. The latest such case is *Brown v. Physicians Mutual Insurance Co.*, 679 S.W.2d 836 (Ky.App.1984), in which plaintiff, a secretary for the defendant insurance company, noticed procedural irregularities and improper conduct on the part of the salesman. She reported her misgivings to her supervisor and attempted to report them to the state insurance commission. She sued, alleging that the company fired her for her efforts. The court of appeals held that public policy required that employees report violations of the insurance code to the state authorities, and an em-

ployee who claims that he was fired contrary to that policy states a cause of action for wrongful discharge.

In *McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or.App. 107, 684 P.2d 21, 23 (1984), the plaintiff alleged that she was fired for threatening to report to the state health division violations of a nursing home patient's rights under the Oregon Nursing Home Patient's Bill of Rights. The court held that the plaintiff had a duty to report violations analogous to the duty to serve on a jury or to avoid defamation. A discharge of an at-will employee for reporting a violation of the state's policy to the proper authority would be a discharge for fulfilling a societal obligation and would be actionable.

Another such case is *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 15–17, 421 N.E.2d 876, 878–80 (1981). There a managerial employee was fired for supplying information to a local law enforcement agency that an International Harvester employee might be involved in a violation of the criminal code and for agreeing to assist in the investigation and the trial of the employee. Recognizing plaintiff's right of action for retaliatory discharge, the court held (at 878) that "[w]hen a discharge contravenes public policy in any way the employer has committed a legal wrong. However, the employer retains the right to fire workers at will in cases 'where no clear mandate of public policy is involved' (*Leach v. Lauhoff Grain Co.*, (1977), 51 Ill.App.3d 1022, 1026, 9 Ill. Dec. 634, 366 N.E.2d 1145)." The Illinois court also held (52 Ill.Dec. at 16–17, 421 N.E.2d at 879–80) that

> no public policy [is] more important or more fundamental than the one favoring the effective protection of the lives and property of citizens....

> No specific constitutional or statutory provision requires a citizen to take an active part in the ferreting out and prosecution of crime, but public policy nevertheless favors citizen crimefighters ....

Continuing, the court said (at 880), "The foundation of the tort of retaliatory discharge lies in the protection of public policy, and ... a clear public policy favor[s] investigation and prosecution of criminal offenses."

Among the most frequently cited cases is *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385, 387–89 (1980), in which Sheets complained that he was fired from his job as quality control director and operations manager for reporting to his supervisors deviations from defendant's standards and labels in that some vegetables were substandard and some meat components underweight. Such deviations resulted in false or misleading labels that violated the Connecticut Uniform Food, Drug and Cosmetic Act. The court sustained plaintiff's petition, holding that "[n]o case has been called to our attention in which, despite egregiously outrageous circumstances, the employer's contract rights have been permitted to override competing claims of public policy, ...." *Id.* 427 A.2d at 387. The court added (at 388) "that the myriad of employees without the bargaining power to command employment contracts for a definite term are entitled to a modicum of judicial protection when their conduct as good citizens is punished by their employers."

Finally, in this category, *Harless v. First National Bank*, 162 W.Va. 116, 246 S.E.2d 270, 276 (1978), holds that where the defendant bank's office manager of the consumer credit department, an at-will employee, alleged that he found and reported to his supervisors intentional violations by the bank of the state Consumer Credit and Protection Act and federal laws and was discharged for doing so, his petition stated a cause of action. The court held that the legislature intended to establish a clear and unequivocal public policy that consumers of credit covered by the Act were to be protected. Such manifest public policy, the court said, should not be frustrated by a holding that a bank employee who seeks to

ensure compliance with the Act may be fired and have no cause of action for wrongful discharge. *Id.* 246 S.E.2d at 276.[9]

A third and fourth category of public policy exception cases have been well developed in a number of jurisdictions, but they have only a tangential bearing on the issues in this case, and that is simply that they clearly establish the efforts of the courts in recent years to temper the harshness of the strict application of the at-will employment doctrine. The first of those additional categories is that general group which frowns on discharge of an at-will employee whose acts are those that sound public policy would encourage, for example, acceptance of a call to jury duty, seeking public office, asserting a right to elect or designate collective bargaining representatives, or joining a labor union.[10] The fourth category includes those cases disapproving of retaliatory discharge of employees whose only sin was the filing of a worker's compensation claim.[11] In some jurisdictions, for example Missouri, but not

all, the worker's compensation statute itself prohibits firing an employee because he has exercised his rights under the statute.

The foregoing lists include only two Missouri cases in which anything like the public policy exception to the at-will doctrine was applied. In *Smith v. Arthur C. Baue Funeral Home,* 370 S.W.2d 249, 254 (Mo. 1963), without mention of the newborn and yet undeveloped and unnamed exception, the court decided that an employer is liable to its employee for wrongful discharge where it fires the employee for exercising his constitutional right to choose bargaining representatives to bargain for him with his employer. The Missouri Constitution, Article I, § 29, has created a modified at-will doctrine, the court said, because it declares a right as between individuals the violation of which is surely a legal wrong.

The second Missouri case to apply the public policy exception is *Hansome v. Northwestern Cooperage,* 679 S.W.2d 273, 275–76 (Mo.1984) (en banc). The court there recognized that, by force of the

**9.** In this category *Parnar v. Americana Hotels, Inc.,* 65 Haw. 370, 652 P.2d 625, 631 (1982), must not be overlooked. There the plaintiff alleged that the hotel fired her because her testimony (not yet called for or given) before a federal grand jury investigating anti-trust violations *might* be damaging to the defendant. The court recognized this at-will employee's right to sue for wrongful discharge under the public policy exception.

**10.** *Smith v. Arthur C. Baue Funeral Home,* 370 S.W.2d 249, 254 (Mo.1963); *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081, 1089 (1984); *Allegri v. Providence-St. Margaret Health Center,* 9 Kan.App.2d 659, 684 P.2d 1031, 1036 (1984); *Miller v. Review Board of The Indiana Employment Security Division,* 436 N.E.2d 804, 810 (Ind.App.1982); *Reuther v. Fowler & Williams, Inc.,* 255 Pa.Super. 28, 386 A.2d 119, 120 (1978); *Nees v. Hocks,* 272 Or. 210, 536 P.2d 512, 515–16 (1975) (en banc); *Montalvo v. Zamora,* 7 Cal.App.3d 69, 86 Cal.Rptr. 401, 404 (1970); *Glenn v. Clearman's Golden Cock Inn, Inc.,* 192 Cal.App.2d 793, 13 Cal.Rptr. 769, 771 (1961).

**11.** Cases holding that a worker discharged for filing claim have a cause of action for wrongful discharge include: *Hansome v. Northwestern*

*Cooperage Co.,* 679 S.W.2d 273, 276 (Mo.1984) (en banc); *Clanton v. Cain-Sloan Co.,* 677 S.W.2d 441, 444–45 (Tenn.1984); *Hansen v. Harrah's,* 675 P.2d 394, 397 (Nev.1984); *Goins v. Ford Motor Co.,* 131 Mich.App. 185, 347 N.W.2d 184, 188–89 (1983); *Firestone Textile Company Division, Firestone Tire & Rubber Co. v. Meadows,* 666 S.W.2d 730, 732–33 (Ky.1983); *Murphy v. City of Topeka-Shawnee County Department of Labor Services,* 6 Kan.App.2d 488, 630 P.2d 186, 192 (1981); *Sventko v. The Kroger Co.,* 69 Mich.App. 644, 245 N.W.2d 151, 153–54 (1976); *Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 23 Ill.Dec. 559, 562–65, 384 N.E.2d 353, 356–59 (1979); *Frampton v. Central Indiana Gas Co.,* 260 Ind. 249, 297 N.E.2d 425, 428 (1973).

Cases holding that a worker discharged for filing a claim has no cause of action include: *Bottijliso v. Hutchison Fruit Co.,* 96 N.M. 789, 635 P.2d 992, 996–97 (N.M.App.1981) (includes excellent statement of the rationale for this minority position); *Kelly v. Mississippi Valley Gas Co.,* 397 So.2d 874, 876–77 (Miss.1981); *Segal v. Arrow Industries Corp.,* 364 So.2d 89, 90 (Fla. App.1978); *Dockery v. Lampart Table Co.,* 36 N.C.App. 293, 244 S.E.2d 272, 275–76 (1978); *Martin v. Tapley,* 360 So.2d 708, 709 (Ala.1978).

amended statute, § 287.780, an at-will employee has a cause of action for wrongful discharge where the cause of his discharge is established to be the fact that he exercised a right given him under the worker's compensation statute. The court there held that, absent such a statutorily prohibited reason for discharge, the employer remains free to fire any employee at will. Again, the court had no need to use the now well-developed public policy exception. The new statute provides in its pertinent part that "[n]o employer or agent shall discharge or in any way discriminate against any employee for exercising any of his rights under this chapter" and gives employees so mistreated a cause of action against the employer.

We have found only one Missouri case in which a public policy exception has been considered, *Ising v. Barnes Hospital*, 674 S.W.2d 623 (Mo.App.1984). In that case, however, no clearly stated and well established public policy of the state was shown. Thus, the basis for liability was absent. Plaintiff's complaint there was that she had been fired because she had refused to sign a consent form stating that she was voluntarily taking a polygraph examination and because she refused to waive all claims against the polygrapher.

### D. *Application of the Public Policy Exception*

■ We turn now to the application of the public policy exception to Mrs. Boyle's case.

First, the federal regulation in question, 21 C.F.R. § 801.410, is a clear mandate of public policy. It is a set of specific directives to eyeglass manufacturers by the Food and Drug Administration, the federal agency charged with statutory responsibility in the area that includes the manufacture of eyeglasses. This regulation, promulgated by the Secretary of Health, Education and Welfare (now the Secretary of Health and Human Services) in conformity with the statute, 21 U.S.C. § 360j(f)(1)(A), "has the force and effect of law to the

same extent as though written into the statute." *Archambault v. United States*, 224 F.2d 925, 928 (10th Cir.1955), (citing *Atchison, Topeka & Sante Fe Railway Co. v. Scarlett*, 300 U.S. 471, 474, 57 S.Ct. 541, 543, 81 L.Ed. 748 (1937)). 1 Toulmin, *Law of Foods, Drugs and Cosmetics*, 2d ed. § 2.5.

The clear mandate of the law and the public policy enunciated in the federal statute and regulation was to prescribe a process of manufacturing eyeglasses which was designed to give eyeglass wearers maximum protection against eye injuries and blindness.

Second, the federal regulation clearly imposes upon defendants as manufacturers a positive duty to harden and test each glass lens they manufacture, but in this case that duty also fell on plaintiff as an employee engaged in the very part of the manufacturing process in which hardening and testing and the mandated record keeping is done. In addition, as the person who conducted the tests, she had the positive duty under the regulation to maintain records of the tests.

Defendants rely on *Bell v. Faulkner*, 75 S.W.2d 612 (Mo.App.1934), as authority for the proposition that defendants could without liability fire plaintiff, an at-will employee, at any time with or without reason. There defendants fired Bell because he would not vote for certain candidates in a city election and would not force members of his family to do so. He sued for wrongful discharge, contending that defendants' conduct was a direct violation of a state penal statute regarding voting and that such violation gave him a cause of action. In reversing the judgment for Bell, the court did not address the question whether the public policy of the state had been violated. It simply said that the penal statute did not itself create a cause of action in plaintiff for damages. The court did not discuss and apparently did not consider whether, aside from the statute, Bell might have had a common law action for wrong-

ful discharge, the issue we are considering. Totally aside from those considerations, we believe that no modern Missouri court would, on the egregious facts presented in *Bell v. Faulkner,* decide the case against Bell as the court of appeals did in 1934. *Cf. Smith v. Arthur C. Baue Funeral Home, supra,* 370 S.W.2d 249 (Mo.1963) (approving cause of action where employee fired for exercising a constitutional right).

Defendants also rely upon *Christy v. Petrus,* 365 Mo. 1187, 295 S.W.2d 122 (1956) (en banc). The workmen's compensation statute then in effect provided that an employer who fired an employee for exercising his rights to workmen's compensation would be guilty of a misdemeanor. The court held, nevertheless, that violation of that law did not give plaintiff Christy a cause of action for wrongful discharge because the statute (unlike the federal regulation in this case) created no positive duty in the employer and creates no cause of action in plaintiff but merely provides a criminal penalty for firing an employee because he exercised his rights. The court did not discuss and apparently did not consider whether, aside from the statue, Christy might have had a common law action in tort arising out of defendant's violation of the clear mandate of the workmen's compensation law. That is now the question before us. The same may be said of each of the other cases defendants rely upon on this issue.

Plaintiff Boyle was fired, according to Count III, because she warned defendants that she would notify the FDA of their illegal practices if they did not stop and because, despite her warnings, defendants chose to continue to violate the positive duty laid upon them by the federal regulation and to continue to insist that their employees do the same. She might have added, as the record clearly indicates and the jury apparently believed, that she was also fired for refusing to violate the FDA regulation, for persisting in hardening and testing lenses in compliance with the regulation and for actually reporting defendants' violations to the FDA. Under the public policy exception, any one of those allegations, including those now in Count III, would state a cause of action. She should be permitted to amend her petition accordingly.

### Conclusion

■ Although employers generally are free to discharge at-will employees with or without cause at any time, they are not free to require employees, on pain of losing their jobs, to commit unlawful acts or acts in violation of a clear mandate of public policy expressed in the constitution, statutes and regulations promulgated pursuant to statute. The at-will employment doctrine does not depend upon the employer having such a right. The employer is bound to know the public policies of the state and nation as expressed in their constitutions, statutes, judicial decisions and administrative regulations, particularly, as here, those bearing directly upon the employer's business.

As many of the decided cases illustrate, the burden of the at-will employment doctrine seems to be falling most heavily and harshly upon professional and upper and middle level employees.[12] They have the least protection. Most are at-will employ-

---

**12.** Examples of such employees are found in the following cases: *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081 (1984) (division controller; 17 years with the company); *Wheeler v. Caterpillar Tractor Co.,* 123 Ill.App.3d 539, 78 Ill.Dec. 908, 462 N.E.2d 1262 (1984) (radiation testing employee; 24 years with company); *Brockmeyer v. Dun & Bradstreet,* 113 Wis.2d 561, 335 N.W.2d 834 (1983) (Wisconsin district manager, credit service; 11 years with the company); *Meredith v. C.E.*

*Walther, Inc.,* 422 So.2d 761 (Ala.1982) (personnel director and in-house attorney; 6 years with the company); *Suchodolski v. Michigan Consolidated Gas Co.,* 412 Mich. 692, 316 N.W.2d 710 (1982) (senior auditor; 4 years with the company); *Cloutier v. Great Atlantic & Pacific Tea Company, Inc.,* 121 N.H. 915, 436 A.2d 1140 (1981) (store manager; 38 years with the company); *Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (Md.1981) (assistant general manager of printing division at $60,000 per

ees and few have job security through union or individually negotiated contracts. They have the most to lose, frequently being the long-term employees who have the greatest responsibility and substantial investment in and the highest expectations from their careers. Often they are at an age when replacement of their life and medical insurance programs and their retirement plans are difficult or impossible. They are the most vulnerable to the improper demands of employers who find it profitable to take chances with anti-trust and consumer fraud violations, environmental pollution, health-related misconduct, defense procurement fraud, and the like. The at-will employment doctrine does not include, contemplate or require a privilege in the employer to subject its employees to the risks of civil and criminal liability that participation in such activities entails.

The public policy exception is narrow enough in its scope and application to be no threat to employers who operate within the mandates of the law and clearly established public policy as set out in the duly adopted laws. Such employers will never be troubled by the public policy exception because their operations and practices will not violate public policy.

■ Accordingly, where an employer has discharged an at-will employee because that employee refused to violate the law or any well established and clear mandate of public policy as expressed in the constitution, statutes and regulations promulgated pursuant to statute, or because the employee reported to his superiors or to public authorities serious misconduct that constitutes violations of the law and of such well established and clearly mandated public policy, the employee has a cause of action in tort for damages for wrongful discharge.

In this case plaintiff Boyle has stated a cause of action for wrongful discharge against the defendants in alleging that they fired her for threatening to report their activities and practices to the Food and Drug Administration. Upon remand she should be permitted if she wishes to amend Count III of her petition to incorporate those allegations the evidence seems to support and which, when liberally construed, Count III seems to imply.

Accordingly, we reverse the judgment of the circuit court on Count III of the petition and remand that count to the circuit court for further proceedings; in all other respects we affirm the judgment of the circuit court.

KENNEDY, J., concurs.

BERREY, J., dissents by way of separate opinion.

BERREY, Judge, dissenting.

I respectfully dissent from the majority opinion. In view of the recent pronouncement regarding discharge of at will employees as set forth in *Dake v. Tuell*, 687 S.W.2d 191, 193 (Mo. banc 1985), I must dissent.

year; 3 years with the company); *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981) (management position; 16 years with the company); *Mau v. Omaha National Bank*, 207 Neb. 308, 299 N.W.2d 147 (1980) (supervisor of mail room; participant in retirement program, profit-sharing plan and receiving health insurance benefits from bank; 28 years with the bank); *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980) (medical doctor, director of medical research/therapeutics; 4 years with the company); *Tamney v. Atlantic Richfield Co.*, 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980) (retail sales representative; 15 years with

the company); *Keneally v. Orgain*, 186 Mont. 1, 606 P.2d 127 (1980) (account manager; 7 years with the company); *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980) (quality control director and operations manager; 4 years with the company); *Harless v. First National Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978) (office manager of bank's consumer credit department; 9 years with the bank); and *Roberts v. Atlantic Richfield Co.*, 88 Wash.2d 887, 568 P.2d 764 (1977) (en banc) (lower mid-management employee with supervisory duties; 16 years with the company).