Steven L. **KOMM**, Plaintiff,

v.

Henry McFLIKER, et al., Defendants.

No. 85–0862–CV–W–6.

United States District Court,
W.D. Missouri, W.D.

June 20, 1987.

Richard L. Routman, Grier & Swartzman, Kansas City, Mo., for plaintiff.

Joel Pelofsky, Shughart, Thomson & Kilroy, Kansas City, Mo., for defendant McFliker.

Michael Waldeck, Niewald, Waldeck, Norris & Brown, Kansas City, Mo., for defendant Universal.

**ORDER**

SACHS, District Judge.

Before the court is plaintiff's Motion for Reconsideration of the Dismissal of Counts III and IV of Plaintiff's First Amended Complaint and for Leave to Amend. For reasons set forth below, the motion will be denied with respect to Count III and granted with respect to Count IV.

Count III of plaintiff's First Amended Complaint purported to state a cause of action by a "whistle blower" in tort for wrongful discharge. By order of September 29, 1986, the claim was dismissed because plaintiff was not an at-will employee and he had failed to identify any "duty that [was] 'superimposed by operation of law as an incident of the relationship between the parties rather than the contract.'" *Nollman v. Armstrong World*, 603 F.Supp. 1168, 1172 (E.D.Mo.1985) (quoting *General Dynamics Corp. v. Selb Manufacturing Co.*, 481 F.2d 1204, 1216 (8th Cir.1973), *cert. denied* 414 U.S. 1162, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974)). Plaintiff contends now, as he did in opposition to the original motion to dismiss, that the public policy doctrine enunciated in *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859 (Mo.App.1985), is not limited to at-will employment relationships. This contention is simply not supported by relevant cases. All Missouri cases specifically refer to the public policy argument as an exception to the at-will employment doctrine, *e.g. Boyle*, 700 S.W.2d at 871; *Beasley v. Affiliated Hos-*

*pital Products,* 713 S.W.2d 557, 561 (Mo. App.1986), and plaintiff has failed to direct the court's attention to any case from any jurisdiction which holds that the public policy exception affords a tort remedy to definite term employees.

Independent research discloses what is at least a dictum favorable to plaintiff's contention in a California decision. *Koehrer v. Superior Court,* 181 Cal.App.3d 1155, 226 Cal.Rptr. 820, 826 (1986). Whether the Missouri courts would accept this development in the law of tortious discharge is speculative.

Further consideration has been given, however, to *Boyle v. Vista Eyewear, Inc., supra,* in which, by a split decision, the intermediate appellate court attempted to distinguish *Dake v. Tuell,* 687 S.W.2d 191 (Mo.1985) (en banc). The *Boyle* majority, in a "whistle blower" case like that at bar, ruled that *Dake* was not a bar to such litigation because the plaintiff in *Dake* had chosen to proceed on the theory of prima facie tort rather than tortious discharge. While it is conceivable that the Missouri Supreme Court simply held that plaintiff must lie in the legal bed that he had mistakenly chosen, the language of the court is very much stronger than necessary to such a procedural ruling. Going beyond the "sole issue" initially stated, the court reaffirmed the view that in Missouri "it is firmly established that absent a contrary statutory provision an at will employee cannot maintain an action for wrongful discharge ..." 687 S.W.2d at 192–3. This "firmly established" rule was not followed in *Boyle.* After further deliberation I am, with due deference, unable to accept *Boyle* as stating current Missouri law.

Judge Blackmar's concurring opinion in *Dake* is of special pertinence to this conclusion. Judge Blackmar protested that it was unnecessary to announce a highly restrictive doctrine that tortious discharge can only be asserted when plaintiff can claim statutory protection. But he said, "I *agree* that the alleged discharges for 'whistle blowing' should not give rise to a claim for damages for wrongful termination. Such a holding is supported by the great weight of modern authority. See Krauskopf, 'Employment Discharge: Survey and Critique of the Modern At Will Rule,' 51 UMKC Law Review 190, 237–239. The principal opinion need go no further than this." 687 S.W.2d at 194. (Emphasis added.)

If one accepts Judge Blackmar's opinion in *Dake* and his view of the intent of the majority in that case, *Boyle* does not correctly enunciate the applicable Missouri law. It seems probable that Judge Blackmar sensed the true thrust of the majority opinion on his court and soundly resolved the ambiguity in language. Further, Judge Blackmar seems to capture and follow Professor Krauskopf's appraisal of the whistle blowing issue.

As *Boyle* and *Dake* make clear, there are strong policy reasons favoring both sides of this case. While it would be inappropriate for a federal judge to second-guess the policy views in *Boyle,* I feel obligated to accept the views of the Missouri Supreme Court where I conclude (based on the indicia noted above) that they are contrary to the views of a later decision by an intermediate appellate court. *R.W. Murray Co. v. Shatterproof Glass Corp.,* 697 F.2d 818, 826–9 (8th Cir.1983); *Matco Tools Corp. v. Pontiac State Bank,* 614 F.Supp. 1059, 1064–5 (E.D.Mich.1985) (and authorities cited therein).

Other intermediate appellate panels in Missouri have clearly accepted *Dake's* sweeping reaffirmation of the rule against asserting wrongful discharge claims in the absence of contractual protection or a statutory umbrella. *Tippit v. Jepco, Inc.,* 726 S.W.2d 877, 878 (Mo.App.1987); *Reed v. Sale Memorial Hosp. & Clinic,* 698 S.W.2d 931, 940 (Mo.App.1985); *Neighbors v. Kirksville College of Osteopathic Medicine,* 694 S.W.2d 822, 823–4 (Mo.App.1985); *Burkin v. Burl. No. R. Co.,* 690 S.W.2d 508 (Mo.App.1985); *Sanders v. Public Water Supply Dist.,* 690 S.W.2d 506, 507 (Mo. App.1985). It is of interest that *Tippit* cites *Boyle* as well as *Dake* as conforming to the above rule, thus suggesting that the result in *Boyle* may be sound where an alternate basis of recovery was plaintiff's

being "fired for refusing to violate the FDA regulation ..." 700 S.W.2d at 877. The present case, however, presents a simple "whistle blower" contention in that plaintiff "claims he was discharged in retaliation for his reporting of corporate wrongdoing and the wrongdoing of his superior, Henry McFliker." Suggestions in Support of Motion for Reconsideration. (Doc. 133, page 3.)

The motion to reconsider the dismissal of Count III will therefore be denied.

This court's September 29, 1986, order also dismissed Count IV of plaintiff's First Amended Complaint, which purported to state a claim under the Racketeer Influenced Corrupt Organizations Act (RICO), under the analysis of *Superior Oil Co. v. Fulmer*, 785 F.2d 252 (8th Cir.1986), for failure to allege more than a single fraudulent scheme. Plaintiff seeks reconsideration of that ruling and also seeks leave to file a Second Amended Complaint, which attempts to expand and clarify the RICO allegations. These allegations are central to the viability of the RICO claim, and will therefore be detailed below.

Paragraph 10 of the proposed complaint addresses the sale of $1.943 million worth of Universal Money Centers (UMC) debentures prior to May of 1985. Plaintiff contends that these sales may be voidable since McFliker actually effectuated the transactions but ceased being an employee of UMC on March 6, 1985, and was not a registered broker. The failure to disclose this fact in UMC's May 15, 1985, 10K form or otherwise is separately alleged as fraud and a violation of federal securities laws. Further fraudulent non-disclosure is alleged in the failure to report significant conditions and restrictions with respect to the sale of $1.8 million of the debentures, including the facts that (1) the $1.8 million was sold to a single investor, (2) the money had not yet been paid to UMC, (3) McFliker or an affiliated corporation were to receive $180,000 as commissions, and (4) $400,000 was to be paid to the Bank of Kansas City to release collateral pledged personally by McFliker on other UMC obligations. Finally, paragraph 10 alleges that Phillip Kusnetzky knew of the above facts, that by virtue of his roles as counsel for both UMC and McFliker he had a direct conflict of interest, and that it was improper to not disclose this conflict in proxy solicitations seeking to elect Kusnetzky as a director of UMC.

Paragraph 11 alleges various improprieties in the sales or solicitations for sales of automatic teller machines (ATMs), the primary product of UMC. The first of these is that McFliker sent out ATM sales brochures which overstated the number of ATMs currently in operation, under construction and scheduled for construction. Second, it is alleged that McFliker made false or misleading representations while soliciting business from financial institutions. The third allegation involves transactions in which McFliker sold ATMs to John Hudson and Savings Investment Service Corporation (SISCO). UMC received full payment for the machines, but McFliker told Hudson and SISCO that UMC would assist in making payments on loans obtained for the purchases. The "assistance" was rendered in the form of McFliker directing UMC to pay billings for services from Hudson and SISCO when no services had actually been performed.

Paragraph 12 alleges improprieties in the proxy solicitation seeking votes to elect Paul B. Rossan as a UMC director. The underlying conduct is described by incorporating paragraphs 10 and 11 of the complaint. These allegations are summarized above and need not be reiterated.

Improper proxy solicitations are also the subject of paragraph 13. While the allegations are rather detailed, they may be summarized for present purposes as omissions of two series of transactions. The first involves a contract between UMC and Universal Money Centers Canada (Canada) in which UMC eventually wrote off as uncollectible $279,576 in fees from Canada. Plaintiff alleges that Canada's inability to pay was due in large part to McFliker depleting its assets for inappropriate purposes. The second series of transactions arose in the context of making Universal Money Centers PLC (PLC) a publicly held

corporation. As a condition precedent to the public offering, the Missouri and Oklahoma securities agencies required that certain large shareholders of PLC, including one Raymond Hatch, place their stock in a trust and agree not to sell for six years. Plaintiff alleges that, despite this restriction, McFliker "caused" plaintiff and Rossan to agree to purchase Hatch's stock at Hatch's option. Upon Hatch's exercise of the option, McFliker aided plaintiff and Rossan in obtaining a loan from PLC for the purchase price. When this loan was subsequently deemed ultra vires by a regulatory agency, McFliker arranged for refinancing through the Johnson County Bank. Finally, it is alleged that UMC paid the interest on this loan.

Paragraphs 29 through 33 allege a stock price manipulation conspiracy between McFliker and Fitzgerald, DeArman & Roberts, Inc. (Fitzgerald). While the specific allegations are again quite detailed, the essence of the conspiracy may be briefly described. Fitzgerald, an Oklahoma brokerage firm, was the market maker in over the counter trading of UMC common stock. Fitzgerald would notify McFliker whenever it received more sell orders for UMC stock than could be sold at the current market price. Rather than allowing a reduction in the market price, the stock would be sold to McFliker or his nominees at the prevailing price. The market price was thereby artificially maintained and supported.

The key issue presented by the pending motion is whether the above allegations, if true, constitute a pattern of racketeering activity under RICO. In the now famous footnote 14 of *Sedima, S.P.R.L. v. Imrex Company,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Court cited with approval language from Senate Report No. 91–617 at 158 (1969), indicating that a "pattern" is characterized by "continuity plus relationship." 105 S.Ct. at 3285 n. 14. The Eighth Circuit has further defined the continuity prong of this test as requiring more than a single fraudulent scheme. *Superior Oil Co. v. Fulmer,* 785 F.2d 252, 257 (8th Cir.1986); *Holmberg v. Morrissette,* 800 F.2d 205, 210 (8th Cir.1986); *Deviries v. Prudential-Bache Securities, Inc.,* 805

F.2d 326, 329 (8th Cir.1986). Allegations of multiple predicate acts are therefore insufficient to state a civil RICO claim if they are merely subdivisions of a single scheme. *Bigger v. American Commercial Lines,* 652 F.Supp. 123, 128 (W.D.Mo.1986); *Madden v. Gluck,* 636 F.Supp. 463, 465 (E.D. Mo.1986); *Allright Missouri, Inc. v. Billeter,* 631 F.Supp. 1328 (E.D.Mo.1986).

■ Having carefully reviewed the allegations of the Second Amended Complaint, I am convinced that they encompass "related but distinct" schemes. *See Deviries,* 805 F.2d at 329. The allegations regarding sales of UMC debentures can fairly be classified as a single scheme, including the "cover-up" in proxy solicitations and the various underlying allegations of mail, wire and securities fraud. Similarly, allegations regarding sales of ATMs, fees from UMC Canada, the public offering of UMC PLC, and market manipulation of UMC common stock point to four separate schemes. Cases which have found a single scheme typically involve either a single series of transactions which effect a number of people, *e.g. Madden,* 636 F.Supp. at 464–65 (single check kiting scheme resulted in 5,643 plaintiffs being defrauded), or multiple frauds effecting a single victim. *E.g. Deviries,* 805 F.2d at 329 (single investor alleged that brokerage house and individual broker made fraudulent misrepresentations to induce him to open an account and thereafter "churned" the account). The present plaintiff's allegations involve substantially different methods and potential victims. Any attempt to define all of this conduct as a single scheme would ignore the practicalities of the situation and would effectively make the relationship and continuity prongs of the pattern test mutually exclusive.

■ A further problem with the RICO claim, in its amended form, is that in some forums it has been ruled that a whistle blower discharge is only indirectly caused by the pattern of illegal conduct alleged and therefore is not susceptible to RICO relief. *Morast v. Lance,* 807 F.2d 926, 933 (11th Cir.1987); *Nodine v. Textron, Inc.,*

**928**

819 F.2d 347 (1st Cir.1987). The district court in the Bert Lance case noted disagreement with Eighth Circuit law which was deemed to be contrary. *Morast v. Lance,* 631 F.Supp. 474, 481 (N.D.Ga.1986). But the Eighth Circuit seems to be holding firm in allowing RICO recoveries when the illegal conduct has indirectly harmed the plaintiff. *Terre du Lac Ass'n., Inc. v. Terre du Lac, Inc.,* 772 F.2d 467, 473 (8th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1460 & 1461, 89 L.Ed.2d 718 (1986). Therefore, although plaintiff does not claim that he was terminated for refusing to act illegally (and thus is not under the small shield offered by the *Dake* case, as it seems to be currently construed), he does now allege a claim for which he could apparently receive relief in this Circuit, under RICO.

Defendant poses no specific objection to the motion for leave to amend other than his general opposition to the motion for reconsideration. Moreover, defendant has been on notice of the general nature of the RICO claim since the institution of this suit, and would therefore not be prejudiced by filing of the Second Amended Complaint. Leave will therefore be granted.[1] Accordingly, it is hereby

ORDERED that plaintiff's Motion for Leave to Amend is GRANTED. The Clerk is directed to file the tendered Second Amended Complaint. It is further

ORDERED that Count III of the Second Amended Complaint is DISMISSED. The Motion for Reconsideration is GRANTED with respect to Count IV, which shall remain a part of the case.

---

1. The court recognizes that Count VI remains in controversy. The viability of this claim will be addressed in a separate order.